UNITED STATES DISTRICT COURT EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| LESLEY ANN SAKETKOO, MD, MPH | ECF CASE |
| Plaintiff, | |
| v. | |
| | No.: 19-cv-12578 |
| TULANE UNIVERSITY SCHOOL OF MEDICINE, ADMINISTRATORS OF THE TULANE EDUCATIONAL FUND, LEE HAMM, MD, AND JOSEPH LASKY, MD, | JURY TRIAL REQUESTED |
| Defendants. | |

INTRODUCTION

1.     This action concerns the long-standing hostile and discriminatory work environment that women physicians, researchers and staff faced at the Tulane School of Medicine. This work environment was no secret. The School of Medicine's Dean, Dr. Hamm, knew about it, did nothing and – worse – protected the bad actors. Tulane University's Office of Institutional Equity("OIE") likewise did nothing to end it. The illegal conduct includes:

- Repeated instances of physical intimidation and threatening of women employees and a culture of protecting male perpetrators;

- Persistently demeaning women's efforts and work, including Defendant Dr. Joe Lasky yelling at Plaintiff Dr. Saketkoo (a woman physician in his group) that it was "not her place" to make improvement suggestions for patient care; and on another occasion prompting her with a question to discuss her research and then

and menacingly shutting her up with "We don't need you thinking!  We need you working";

- Taking no action: (a) against a male supervisor (Dr. Lasky) who is physically threatening with women staff and has referred to women employees as the "enemy" and "bitches;" and (b) against another male Professor of Medicine in Dr. Lasky's section who physically threatened a female staff member, including charging across his desk at her and pounding on his chest like an ape;

- Male management usurping funding brought into the School of Medicine by women physicians and researchers for clinical studies and claiming it as their own or redistributing those funds to male faculty and then labeling those women as "not productive" in failing to bring funding into the School of Medicine;

- Paying male physicians more than their female counterparts, including paying newly trained/less experienced male physicians who joined the Tulane School of Medicine staff the same or greater salaries as female physicians supervising them;

- Terminating two highly respected female physicians who would not accept a drastic reduction in their salaries that were far below the salaries of male faculty in comparable positions;

- Depriving women in academic leadership positions of tenured faculty positions;

- Smothering the careers of women staff by "parking" and not allowing their research studies to go forward and discouraging them from applying for funding opportunities; instead promoting and fostering studies by male faculty to further their careers over female faculty, and labeling women who question the conduct as "difficult to work with," "not being a team player," "making waves," "stepping out of line;"

- Using women's effort and expertise without fair representation toward their salaries, and then threatening to decrease salary, increase workload or termination;

- Retaliating against and wrongfully terminating women who made complaints about the abusive work environment and discriminatory treatment.

2.      Plaintiff Lesley Ann Saketkoo, MD, MPH ("Plaintiff" or "Dr. Saketkoo") asserts gender-based discrimination, hostile work environment and retaliation claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq*. ("Title VII") against

Defendants Tulane University School of Medicine ("Tulane School of Medicine") and Administrators of the Tulane Educational Fund ("Tulane University").

3.     Dr. Saketkoo asserts gender-based discrimination and hostile work environment claims under the Louisiana Employment Discrimination Law, La. R.S. 23:301, *et seq*. ("LEDL") as against Defendants Tulane School of Medicine, Tulane University, Lee Hamm, MD ("Dr. Hamm"), and Joseph Lasky, MD ("Dr. Lasky"), jointly and severally.

4.     Plaintiff Dr. Saketkoo asserts an Equal Pay Act, 29 U.S.C. § 201(d)(1) *et. seq.*, ("EPA") claim against Defendants Tulane School of Medicine, Tulane University, Dr. Hamm, and Dr. Lasky, jointly and severally.

5.     Plaintiff Dr. Saketkoo asserts civil assault and intentional infliction of emotional distress claims against Dr. Lasky.

<u>JURISDICTION, VENUE & EXHAUSTING ADMINISTRATIVE REMEDIES</u>

6.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 and 42 U.S.C. § 12181, as Plaintiff's claims arise under Title VII, 42 U.S.C. §§ 2000e (f) -(5)(e) and (5)(f)(3).

7.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's Louisiana state law claims.

8.     Venue is proper under §1391(b)(2) as a substantial part of the events giving rise to the claims occurred in this District.

9.     Plaintiff has complied fully with all prerequisites and the jurisdiction of this court

under Title VII and has received a right to sue letter.[1]

<u>THE PARTIES</u>

10.     Plaintiff Dr. Lesley Ann Saketkoo, a person of the full age of majority, a female hired in January, 2015 by Tulane School of Medicine, and a resident of the State of Louisiana, filed a gender discrimination and retaliation charge with the U.S. Equal Employment Opportunity Commission against Tulane School of Medicine and Tulane University.

11.     Tulane School of Medicine is a corporate entity located in New Orleans, Louisiana and is part of the larger Tulane University system and employs Dr. Hamm and Dr. Lasky.

12.     Tulane University is a corporation licensed to do business and doing business in New Orleans, Louisiana which runs Tulane School of Medicine.

13.     Tulane University and Tulane School of Medicine share employees, facilities, operations and act, effectively, as one integrated enterprise.

14.     Dr. Lasky is an individual who is a resident of Orleans Parish.

15.     Dr. Hamm is an individual who is a resident of Orleans Parish.

---

[1] Exhibit A - Right to Sue Letter

<u>STATEMENT OF FACTS</u>

<u>Dr. Saketkoo's Background</u>[2]

16.     Dr. Saketkoo received her post-graduate degrees and training in pediatrics and internal medicine at Tulane University.

17.     Dr. Saketkoo received a number of awards during her training for clinical excellence and humanism as well as research, and completed a rheumatology fellowship at LSU in June 2008.

18.     From 2015 until her unlawful termination on June 30, 2019, she was an Associate Professor of Medicine in the Department of Medicine at the Tulane School of Medicine and held faculty appointments in both pulmonary medicine and rheumatology.   From 2011 until transitioning to Tulane in January 2015, Dr. Saketkoo was an Assistant Professor of Medicine in the Department of Medicine at the LSU School of Medicine.

19.     In 2011, she established the Scleroderma and Sarcoidosis Patient Care and Research Center between Tulane and LSU with international recognition. While at LSU, she also founded and is a co-director of the LSU-Tulane collaborative Comprehensive Pulmonary Hypertension Center at the University Medical Center New Orleans ("UMC").[3]

---

[2] Headers are for organizational purposes only.

[3] UMC is the academic medical center of LCMC Health, a Louisiana-based, not-for-profit health system, which has a legacy in New Orleans dating back nearly 300 years with its beginnings at Charity Hospital and University Hospital. UMC is an independent organization that partners with local healthcare institutions like LSU Health New Orleans and the Tulane School of Medicine.

20.     Dr. Saketkoo is an internationally recognized researcher, educator and clinician in scleroderma/systemic sclerosis ("SSc"), sarcoidosis, myositis, pulmonary hypertension ("PH") and interstitial lung disease ("ILD")/pulmonary fibrosis.

21.     Dr. Saketkoo has received numerous awards and recognitions, including the Scleroderma Foundation naming her Doctor of the Year in August 2018.[4] She was the principal investigator ("PI") of a large international study that identified the minimal set of outcome measures for connective tissue disease-related Interstitial Lung Disease and also for Idiopathic Pulmonary Fibrosis for use in clinical trials, is a widely published author of scholarly research, and is the PI for multiple research studies and registries in scleroderma, sarcoidosis, myositis, pulmonary fibrosis and pulmonary hypertension. In 2013, she was awarded the prestigious recognition of "Outstanding Accomplishments by a Young Faculty Member" for outstanding accomplishments in the first three years of appointment with the LSU School of Medicine, presented by the dean of LSU's medical school.

22.     Since 2017, Dr. Saketkoo has taught honors courses at the undergraduate school at Tulane University and her teaching is enthusiastically received with evaluations that describe her lectures as passionate, joyful, compelling and inspiring.

23.     Dr. Saketkoo was "on-call" for general rheumatology every day since her hire in 2015. Dr. Saketkoo would assist in managing cases for Tulane University and all local and

---

[4] See https://news.tulane.edu/tulane-rheumatologist-named-doctor-year-scleroderma-foundation and https://www.youtube.com/watch?v=dh7n0EWRwGU.

regional hospitals at all times of day / night for 365 days regardless of whether she was out of the country.

Dr. Saketkoo's Relationship With Dr. Lasky and Dr. Hamm

24. Dr. Lasky, as section chief of the pulmonary division within the Department of Medicine, supervised Dr. Saketkoo and had managerial responsibilities over her, including deciding her compensation, her clinic hours and to terminate her employment. Dr. Lasky, with this responsibility over her, had significant control over the terms and conditions of her employment.

25. Dr. Hamm, as Dean of the School of Medicine, supervised Dr. Lasky and had ultimate managerial responsibilities over her, including deciding her compensation, her clinic hours and to terminate her employment. Dr. Hamm, with this responsibility over her, had significant control over the terms and conditions of her employment.

Women Not Receiving Equal Opportunities As Their Male Colleagues

26. Dr. Saketkoo started working in the Department of Medicine at the Tulane School of Medicine in January 2015 in the Immunology Section but was later transferred for logistical reasons to the Pulmonary Section under the direct supervision of Dr. Lasky.

27. From early on, she increasingly became aware that women physicians and researchers in the School of Medicine were not provided the same opportunities as their male colleagues, were demeaned, were viewed as servants to support and advance their male colleagues' careers and were readily disparaged – especially by Dr. Lasky.

7

28.    Her initial experience with this harassing and discriminatory environment occurred early in 2015 when she was working on a proposal for a research funding award sponsored by the Dean's Office. The study was very relevant for Louisiana and the New Orleans community involving a mechanism to capture several concomitant but distinct strands of scientific data:   early detection (to offset death and disability) of systemic sclerosis with examination of environmental and occupational exposure (to identify disease triggers).

29.    When Dr. Saketkoo informed Dr. Lasky that she was finalizing her proposal for submission, he told her it was not worth her effort, that she should not bother and that the funding "had already been allocated." She told him the submission deadline was still a few days away. He replied that the reason he knew was because his group was promised the funding and that "a lot of these things are decided behind the scenes." In disbelief, Dr. Saketkoo submitted her proposal. She later learned that the funding was awarded to a junior male colleague in Dr. Lasky's group.  She subsequently realized that this was part of a pattern and practice by the Tulane School of Medicine (and Defendants Lasky and Hamm) of steering advancement opportunities toward less qualified male faculty and away from qualified female faculty.

30.    Dr. Saketkoo's uncommon expertise in both SSc and ILD enabled the Tulane School of Medicine to participate in a global multi-center study to conduct a randomized controlled clinical trial to treat patients with scleroderma related interstitial lung disease. Dr. Lasky asked Dr. Saketkoo to lead the study, which was appropriate given the study's direct relation to her expertise and other research. Dr. Saketkoo performed all the necessary work of the

physician leading the trial.

31.     In late summer 2015, she learned that Dr. Lasky – despite having done no work on the study, having little knowledge in treating scleroderma, and having brought no patients into the study – listed himself as the PI/lead investigator for Tulane's participation. The PI does the major part of the work and is recognized in publications of the study's findings. When Dr. Saketkoo asked Dr. Lasky why she was not listed as the PI since she was doing all the work on the study, he replied that rheumatologists (like Dr. Saketkoo) were not permitted to be PI's on this study and only pulmonologists such as himself.  Dr. Saketkoo later learned that this was part of Dr. Lasky's pattern and practice of using the work and expertise of women faculty to bolster his and other male faculty's careers without giving the women faculty any credit or recognition for their work.

32.     Dr. Lasky's statement on why he did not list Dr. Saketkoo is false and a pretext for discrimination. Many of Dr. Saketkoo's rheumatologist colleagues nationally and internationally were the PIs for their scleroderma centers' participation in the study. Also, she contacted the study's Global PI and National PI, who Dr. Saketkoo knows well and has worked with extensively over the years to inquire whether the site PI required a pulmonologist and not a rheumatologist. They confirmed that requirement does not exist. When Dr. Saketkoo shared this with Dr. Lasky, he had a "talk" with her, with the external exposure of unfair play, reluctantly relented and allowed her to replace him as the PI but reproached her sternly that, while there were a lot of good qualities about her, she was "making waves," "meddling" and making things

"difficult" for herself and others by "stepping out of line."

33.     In late 2015, based on her expertise and patient population, a pharmaceutical company medical science liaison approached Dr. Saketkoo to discuss participating in a clinical trial investigating a medication to treat pulmonary hypertension in patients with interstitial lung disease and pulmonary hypertension. Dr. Saketkoo informed Dr. Lasky of the opportunity and told him she desired to participate in the study and believed she would have good recruitment of Tulane clinic patients.

34.     At Dr. Lasky's request, she put him in contact with the medical science liaison. Dr. Lasky excluded Dr. Saketkoo from the discussions with the sponsor and refused to discuss that matter with her when she inquired. Later, Dr. Lasky told Dr. Saketkoo that he was giving the study to a junior male physician in his group even though she had presented the study to him, was qualified for at least the standing of the co-PI, if not PI, and had patients that would satisfy the study's requirements. Dr. Saketkoo was not included on the study in any capacity, and the male colleague recruited zero patients for the study. This act was part of the pattern and practice by the Tulane School of Medicine (and Defendants Lasky and Hamm) of steering advancement opportunities toward less qualified male faculty and away from qualified female faculty.

35.     In 2016, Dr. Saketkoo was awarded a grant for an investigator-initiated pulmonary hypertension study. The grant money by its express terms could only be used for specified study expenses. In late 2016, when Dr. Saketkoo submitted covered expenses for reimbursement, the Department of Medicine's finance administrator told her that the account

was overdrawn by approximately $16,000 when there should have been over $20,000 left in the account.

36.     Dr. Lasky had siphoned money from the account, violating the grant's express terms, to support in part the research of a male faculty member. The Department of Medicine accountant requested return of the funds. Dr. Lasky continued to siphon the funds driving the account into further deficit, and it took over a year and a half to get Dr. Lasky to replace the siphoned funds in 2018.  Dr. Lasky, upon information and belief, did not misuse male faculty grants in this manner.

37.     In Fall 2017, Dr. Lasky offered Dr. Saketkoo, again relying on her rare expertise in rheumatologic lung disease, a leadership role as co-PI with him in a multi-center national randomized controlled clinical trial in one of her specialty areas: rheumatoid arthritis related interstitial lung disease (RA-ILD).

38.     After Dr. Saketkoo invested significant work in recruiting patients for the study and presiding over patient visits, Dr. Lasky, despite not having expertise in the rheumatologic disorder being studied, shut Dr. Saketkoo out of the study and claimed exclusive credit for the work. He further told the research nurse on the study that Dr. Saketkoo was not to be involved with the care of the patients in the study – even though they were patients she recruited into the study.  This is another example of Dr. Lasky's pattern and practice of using the work and expertise of women faculty to bolster his (and other male faculty's careers) without giving the women faculty any credit or recognition for their work.  Dr. Lasky does not engage in this

conduct with respect to male faculty.

39.     In the end of 2017, Dr. Saketkoo also brought to Dr. Lasky for his approval an advanced sarcoidosis registry study for which the Section would be paid $1,500 for every two patients enrolled. Shortly after when the study was ready to enroll patients, Dr. Lasky's Section would not let her enroll patients in a study that was ready to go and "parked it," in favor of advancing a study of a male faculty member that was in the process of being set up and not ready for enrollment any time in the near future.  Dr. Saketkoo repeatedly asked that the study be allowed to move forward and that she did not need any additional nursing resources from the Section other than to assist with spinning and batch shipping of patient samples. She asserted that she would do all the setting up and collating of binders and forms. Nevertheless, she was not allowed to move forward despite having scores of patients ready to enroll; and from a scientific perspective this study greatly needed to be done.  Dr. Lasky did not interfere in the progress of studies conducted by male faculty; however, he regularly hindered the research (and other endeavors of academic interest) of women faculty in favor of supporting and providing resources to male faculty to advance and promote their research.

40.     Although Dr. Lasky was in charge of the clinics at Tulane University in which he and Dr. Saketkoo saw patients, he ignored Dr. Saketkoo's repeated requests for adequate nursing support and a development of standardized operational protocols, since she was often in clinics without any access to nursing staff and would have to perform nursing functions herself in addition to her physician functions for these complicated pateints.

41.     In contrast, Dr. Lasky always made sure that he and the other male physicians received the highest performing nurses and ignored Dr. Saketkoo's repeated pleas over the years for adequate nursing staff and to support standardized operational protocol that are used in most other institutions that would allow the clinics to run efficiently and improve patient safety for which there were repeated breeches.

A Hostile Work Environment Targeted At Dr. Saketkoo and Other Women

42.     The abusive treatment of women at all levels and in diversese environments including the hospital, particularly by Dr. Lasky, was well-known and reported on numerous occasions to the Dean of the School of Medicine (Dr. Hamm) and the Tulane University Office of Institutional Equity ("OIE"): the Department responsible for investigating discrimination and harassment complaints University-wide and enforcing anti-discrimination policies.

43.     Dr. Lasky disdained and frequently and physically lashed out at women faculty and staff – and even more so at independent thinking, self-motivated and strong professional women.

44.     For example, in late 2015, Dr. Saketkoo presented potential opportunities for improvements of patient care at the Tulane Lung Center. Dr. Lasky angrily cut her off belittling her that it was "not her place" to discuss the needs of the Center. Female colleagues had warned Dr. Saketkoo about how to approach him since likes to be in charge.  Dr. Lasky did not treat and belittle male faculty in this manner.

45.      On another occasion, in 2016 ,when Dr. Lasky and Dr. Saketkoo were convened

in a small physician work room at Tulane clinics, she inquired about how funds from her pharmaceutical company sponsored trials would be applied to support her salary and he suddenly and frighteningly flew off the handle, yelling at here with his arms flailing angrily towards her in the small space, "I'm sick of this! All this questioning! Do you think I'm cheating you?," intimidating her and making her fearful. Dr. Lasky was well known to be physically threatening to women faculty and staff in this manner and did not physically threaten male faculty and staff.

46.     In response to her work-related questions, Dr. Lasky frequently would yell (in person and on the phone) and get close to her in a physically threatening matter, raising his finger in her face, demeaning statements such as "stop it! just stop it now! Do you understand? Just stop it!" Dr. Saketkoo repeatedly asked Dr. Lasky not to speak to her in that way and that he needed to find other ways of communicating. Dr. Lasky, however, continued to make threatening statements like those throughout her employment.  Dr. Lasky did not physically threaten male faculty and staff.

47.     In 2017, while in the clinic together, Dr. Saketkoo and Dr. Lasky were discussing a mutual patient. Dr. Lasky was hovering over Dr. Saketkoo as she was documenting the patient's heart catheterization results. Dr. Lasky had roughly calculated the pulmonary vascular resistance ("PVR") – an important value that determines the course of treatment for a patient – as a ballpark figure in his head. Dr. Saketkoo began calculating the actual PVR value to document in the patient's notes and inform the treatment plan when Dr. Lasky yelled at her angrily: "What are you doing? Stop it!  You don't need to calculate it, I already told you what it was!" Dr. Lasky

remained hovering over her, and she was too shocked and intimidated to continue the patient's calculation with Dr. Lasky in her proximity and had to wait to complete her documentation when Dr. Lasky was not around. Dr. Lasky does not treat male faculty in this manner.

48.   In late Summer 2018, Dr. Lasky ridiculed research that Dr. Saketkoo was undertaking to study more efficient models of accessible targeted precision muscle training to improve the lives of people living with cardiopulmonary diseases. Part of the study is examining the precise and fairly rapid conditioning that occurs in dance training. Dr. Lasky mockingly asked if Dr. Saketkoo had "danced away scleroderma." When Dr. Saketkoo started to explain the research project to ease and re-direct the aggression from his manner, he interrupted during her first sentence and, in a harsh voice, menacingly chided her, while pointing his finger at her: "We don't need you thinking!  We need you working."

49.   On September 13, 2018, while Dr. Saketkoo and Dr. Lasky were walking to his office for a meeting together, he berated her for not informing him that she was teaching an honors undergraduate class at Tulane University. She attempted to remind him of the many occasions they had discussed the course including the fact that he signed approval forms related to her mentoring the class of 2017 (in their desire to establish a student organization based on their experience of the class), signed off on her evaluations, and that the class was also tied to a pulmonary fellow's research project that he had approved earlier in 2018 for which Dr. Saketkoo was PI, mentor and received a small grant.  Before she could finish a sentence, he exploded and moved close to her, red-faced, trembling and pointing his finger driving it into her face yelling:

15

"if I say I wasn't told about something, that's the end of it and I wasn't told about it!" Despite Dr. Saketkoo saying nothing, standing there stunned and fearful yet again by his violent aggressive response, he continued yelling at her as she stood speechless: "Do you understand? Stop it! You just stop it now! Stop it now!"

50.     Dr. Saketkoo began moving away from him slowly stating, to assuage him but moving to safety, that she could not meet with him now but promised to meet with him when he calmed down and collected himself. He hollered at her that they had to meet "NOW!" and, still gesturing with his pointed finger toward her face, yelled at her that "we have things that need to be talked about!" Dr. Saketkoo was fearful of being physically hurt by Dr. Lasky and tried to be calm as she moved further back from him and told him she would only meet with him now if Dr. Lasky's supervisor (the Chair of the Department of Medicine) was also present. Dr. Lasky does not physically threaten male faculty or staff; however there is a long history of his verbal and physical aggression towards women faculty and staff.

51.     Immediately after this September 13, 2018 incident, Dr. Saketkoo, shaken and seeking help, called a colleague asking for advice on what to do and whether she should go to the Chair of the Department and report the incident. Her colleague advised her not to go to Chair's office, fearing Dr. Saketkoo would not be taken seriously and would lose credibility as being a hysterical women. Dr. Saketkoo then went in person to a Section Chief of another section within the Department of Medicine to seek help. Understanding the toxic climate at Tulane and out of great concern for Dr. Saketkoo's academic welfare, the Section Chief advised Dr. Saketkoo to go

through the chain of command (through the Chair of the Department of Medicine, then Dean of the Medical School, and if granted then OIE) with her complaints, otherwise she would be "destroyed."

52.     In addition to complaining about the September 13, 2018 incident to that Section Chief, on September 18, 2018, she complained about it and Dr. Lasky's overall harassment and discrimination to the OIE. Around the same time she also complained about it to the Assistant Chair of the Department of Medicine. Earlier that summer, Dr. Saketkoo had also informed an Associate Dean of the Medical School about Dr. Lasky's harassing behavior against women faculty.

53.     Dr. Lasky's threatening and harassing behavior against women faculty and staff (and not male faculty and staff) was well known by Defendants Tulane School of Medicine and Tulane University.  Female hospital nursing staff and women faculty had made many complaints over the years to the Dean of the School of Medicine and Tulane's OIE about Dr. Lasky's abusive conduct towards women.

54.     Dr. Lasky engaged in hostile and physically threatening behavior against other women faculty and staff but did not inflict his physical aggressions, abuse and harassment on male faculty or staff. But Tulane never took any action against Dr. Lasky and allowed him to continue his abusive conduct. Tulane School of Medicine not only condoned but encouraged and is responsible for perpetuating and cultivating this discriminatory and hostile behavior towards women employees.

55.     Since the time Dr. Saketkoo started working at the Tulane School of Medicine, she frequently heard Dr. Lasky belittling and demeaning other women faculty and women staff; Dr. Saketkoo did not see or hear Dr. Lasky belittle, demean or yell at male faculty or staff.

56.     In one example in 2015, Dr. Saketkoo was excited about a new collaboration anticipated to make available a procedure recognized to reduce mortality in SSc, with a woman physician who was a Director of a program in another section of the Department of Medicine, whom Dr. Saketkoo had known and admired since Dr. Saketkoo was in medical school at Tulane. Dr. Lasky said that the Director could not be trusted, had stolen and published his research data, and was not a "team player." In her years of knowing the Director and her integrity, Dr. Saketkoo was conflicted about his statements instinctively not letting herself believe them. Several years later, Dr. Saketkoo learned that Dr. Lasky had violently blown up at the Director, who was assisting a student under Dr. Lasky, for a perceived slight and screamed at her, repeatedly calling her a "bitch" and telling her to "go fuck herself."

57.     The Director complained about Dr. Lasky's abusive behavior to her Section Chief who scheduled a meeting with Dr. Hamm to discuss the threatening behavior. Dr. Hamm told the Director's Section Chief that the Director and Dr. Lasky would have to work it out, and he took no action against Dr. Lasky. Dr. Lasky continued to perpetrate threatening behavior against the Director.

58.     In summer 2017, Dr. Lasky told Dr. Saketkoo that she should be wary of a well-regarded female researcher in the Department of Medicine who had obtained a sizable level of

funding for her research lab in fibrosis and scleroderma. Dr. Lasky disparaged the researcher, stating "She is not a team-player" and "is very difficult to work with" because she would not allow Dr. Lasky and a male faculty member to freely, without restriction, have access to her lab and use her resources obtained by her funding (for work being conducted on their unrelated studies) for no compensation or collaborative exchange. Dr. Lasky made these remarks despite the female researcher's offer to help if they presented specific requests. Dr. Lasky has not made similar remarks about any male colleagues, nor had expectations of pilfering a male colleague's lab resources.

59.    In 2018, Dr. Lasky referred to a female Fellow in his Section and under his supervision as the "enemy" and told Dr. Saketkoo she should not be cultivating the Fellow's career. Dr. Lasky has not made similar remarks about any male colleagues or trainees.

60.    Dr. Lasky frequently demeaned female faculty and staff by putting his hand up in their face when they speak to signal they should stop speaking and he does not want to hear about whatever work-related matter they are raising. There were many other instances where Dr. Lasky would disparage female faculty and staff, which he did not do regarding male faculty, staff and trainees. Dr. Lasky has never acted in the same physically or verbally abusive way towards his male colleagues.

61.    Dr. Lasky also demands different standards from women over men. He insisted that one female PhD researcher in his Section needed to obtain two RO-1 NIH grants (which is a virtually impossible task) to stay at Tulane and not be fired. He did not make this requirement for

19

any male PhD in the Section.

62.     Dr. Lasky constantly pressured female physician clinicians to take on more work than their male counterparts. Dr. Saketkoo, as an example, was on call and available to local and regional clinicians virtually 365/24/7 for several years, worked 12-14-hour clinic days plus hospital hours and was being pressured by Dr. Lasky to take on even more clinics or receive a decrease in pay. He did not pressure male physician clinicians in this manner.

63.     Dr. Lasky took pleasure in terrorizing women staff.

64.     Dr. Lasky, for example, while in the presence of his male colleagues, gleefully exclaimed that he was going to punitively assign a last-minute Grand Rounds lecture to a female colleague, smirking and stating: "Just watch. I'm going to make her do it." He did not give similar last minute assignments to men nor did he publicly devalue or terrorize male colleagues.

Overall Discriminatory Environment at Tulane School of Medicine

65.     Dr. Lasky's discriminatory treatment of women faculty and staff is in line with the culture at the Tulane School of Medicine, which discriminates against women and fosters an environment that empowers male faculty to abuse and physically intimidate female employees without consequences.

66.     Tulane pays male physicians more than their female counterparts, including paying newly trained and less experienced male physicians who joined the Tulane School of Medicine staff the same or greater salaries as the female physicians supervising them.

67.     In mid-2018, Defendant Dean Hamm terminated two highly respected female

20

physicians who would not accept drastic reductions in their salaries that were far below the salaries of male faculty in comparable positions.  Dr. Saketkoo was also paid less than her male counterparts at the Tulane School of Medicine upon information and belief.

68.    There are other examples of male faculty members in the Tulane School and Department of Medicine treating women faculty and staff with disdain and abusively.

69.    For example, one male faculty member in 2015 became angry with a research nurse about a work-related matter and charged across his desk pounding his chest like an ape and yelling at her, "you work for ME!" The research nurse, who was supervised by Dr. Lasky, reported the incident to him and told him she wanted to make a formal complaint about this faculty member. Dr. Lasky discouraged her from reporting the incident to anyone and did not report the incident to Human Resources or OIE.  Dr. Lasky also forced her to continue to work with this male faculty member, even though she repeatedly requested not to have to work with him and be subjected to his harassment.

70.    That same male faculty member engaged in other hostile conduct towards female employees. In 2018, with no explanation, he threw out valuable frozen patient samples in a Tulane lab freezer that were part of a study in rare diseases that Dr. Saketkoo was conducting (and were clearly marked with the names and contact numbers of Dr. Saketkoo and her female research nurse) that hampered and set back the study, requring reporting to the IRB and NIH. Dr. Saketkoo reported this conduct to Dr. Lasky who did nothing. All of the discarded samples belonged to women with a rare life-threatening disease for whom access for blood sampling is

difficult and painful due to a diffuse thickening of the skin.  This other male faculty member does not treat male colleagues and staff in this manner.

71.     In the late fall 2018, Dr. Lasky was under investigation for potential financial conflicts of interest of several hundred thousand dollars partially relating to the RA-ILD drug study referenced above that he had shut Dr. Saketkoo out of. Concerned that the study would be dissolved with patients exited from the study, the female research nurse suggested to Dr. Lasky that Dr. Saketkoo as an ILD specialist could simply take over the study. This was a reasonable suggestion since Dr. Saketkoo was already co-investigator and only faculty member in the entire Section published in RA-ILD.  Dr. Lasky got upset at the research nurse and thumping his chest saying "I'm the ILD expert." He then told the research nurse "just wait and see" – implying that there would be a change in Dr. Saketkoo's employment status. The nurse conveyed this to Dr. Saketkoo and said she thought it was important that Dr. Saketkoo know this.

72.     This nurse was not the only faculty member trying to warn Dr. Saketkoo. In early 2018, multiple Section members had warned Dr. Saketkoo to "be careful," "keep her head down," "lie low," because "Dr. Lasky is out to get you," just has he had done to a number of other women faculty under his supervision who had stood up to Dr. Lasky's discriminatory treatment as Dr. Saketkoo had.  Another research nurse came crying to Dr. Saketkoo, referencing the prior women who had stood up to Dr. Lasky and saying, "Lesley, I'm so afraid for you."

73.     Around the same time as these warnings, Dr. Lasky began questioning Dr. Saketkoo's "productivity," claiming she was bringing very little money into the Section and

cited to her amounts that were obviously and drastically understated and had no relation to the funding she was bringing in from her research trials. Dr. Saketkoo met with a financial administrator in the Dean's Office who offered faculty training on Tulane's School of Medicine's billing and financial structuring and how the funds from her trials were allocated to support her salary. The administrator told her that the funding Dr. Saketkoo was bringing into the Section was comparable to other faculty in the Department of Medicine and that there were other faculty who were bringing in less funding.  According to another administrator, there are male faculty in the Department of Medicine who are not bringing in sufficient funding to support their salaries.

74.    The administrator also expressed concern that Dr. Lasky violated School of Medicine policy by never providing Dr. Saketkoo with an annual "Worksheet" showing where funding to support her salary was coming from. After the meeting with Dr. Saketkoo, the administrator apparently contacted Dr. Lasky to inform him that he was required to provide the annual Worksheets to faculty. After printing a worksheet, Dr. Lasky angrily said to Dr. Saketkoo, in sum and substance "Don't ever say I never gave you a worksheet." Dr. Lasky, additionally, angrily threatened Dr. Saketkoo that if she ever went outside the Section again to ask a question that she would be "gone" from the Tulane.  Dr. Lasky did not threaten male faculty with termination for asking routine questions about their employment.

75.    In August 2018, Dr. Saketkoo was asked to sign an Effort Reporting Certification, a form she had never seen before even though she later found out that it was another form that

she should have been receiving and certifying periodically. The form represents in a percentage and dollar amount the weekly effort that a faculty member works on their various sponsored studies. The form she received attributed only $5,000 from her research efforts on sponsored studies, which was tens of thousands of dollars less than the actual amounts she brought in that should be supporting her salary. Dr. Saketkoo learned that Dr. Lasky had been misrepresenting the amount of funding she brought in and was attributing that funding to staff salaries that supported the research of male collegues and that had nothing to do with her sponsored research.

76.     Dr. Lasky has never allowed Dr. Saketkoo or other female researchers to review the budgets for their research or see how the funding was being used, and any inquiries about the status of funds or accounts were met with violent outbursts by "you don't need to know that" or "I take care of that," despite the women researchers being the owner and responsible for those funds. Dr. Lasky does not treat male faculty in this manner.

77.     During a meeting later that year with Department of Medicine accounting to discuss Dr. Saketkoo's questioning the Effort Reporting Certificate's accuracy, Dr. Lasky stared hard and menacingly at her throughout the meeting as if he literally wanted to kill her, and insisted to the others in the room that "this is how I've been doing it for 14 years. Why is it a problem now?"

<u>The Wrongful Termination of Dr. Saketkoo's Employment</u>

78.     On February 15, 2019, Dean Hamm and the Chair of the Department of Medicine called Dr. Saketkoo into a meeting, during which Dean Hamm told her she was being terminated

effective June 30, 2019 at the end of her current contract, but he could not articulate the specific reasons for the termination other than "issues with her productivity," her not being a "team player" and "the spectrum of patients" that she sees.

79.     During the meeting, Dr. Saketkoo informed Dr. Hamm that she had been trying to meet for months with the Chair of the Department of Medicine to inform him of Dr. Lasky's discriminatory and abusive conduct towards her and other women faculty and staff, but that he had repeatedly cancelled the meetings she had scheduled with him. She relayed the above cited specific examples of Dr. Lasky's hostile conduct against women – including that he had grossly misrepresented the amount of funding she brought into Tulane and had diverted funds that she brought into to the Section – and asked that Dean Hamm delay making a decision about her employment until after he investigates the claims. Dean Hamm said he would conduct an investigation but that it would not change the results and that Tulane would not employ her after June 30, 2019.

80.     Dr. Saketkoo later learned that Dean Hamm conducted no investigation. In fact, five weeks later when Dr. Saketkoo sent an email to Dean Hamm on March 27, 2019, memorializing in writing the February 15 termination meeting and Dr. Lasky's discriminatory and abusive conduct towards women, Dean Hamm replied in less than an hour stating:

> It is my understanding that the performance management and counseling you have received at Tulane regarding your job performance and productivity are based on legitimate, non-discriminatory reasons unrelated to protected classifications such as sex. Nevertheless, please be assured that that I, and Tulane,

> take your reported concerns seriously. Accordingly, I have forwarded your report
> to the Office of Institutional Equity, for further review and action.

Dean Hamm gave no explanation for waiting over a month after Dr. Saketkoo informed him of

Dr. Lasky's physically threatening abuse and discrimination to report the conduct to OIE.

81.     When Dr. Saketkoo subsequently met with the OIE investigator and relayed the

above numerous instances of discrimination, hostile work environment, retaliation and EPA

violations, the investigator repeatedly interrupted Dr. Saketkoo and told her this conduct was not

within the purview of OIE.

82.     On July 31, 2019, after purportedly conducting an investigation into the

allegations, OIE sent a letter to Dr. Saketkoo stating:

> Thank you for bringing your concerns about the experiences involving you and
> Dr. Lasky to the University's attention. Specifically, you alleged Dr. Lasky
> engaged in harassing and abusive conduct towards you and other women at
> Tulane. Among other things, you alleged that Dr. Lasky subjected you and other
> women to discrimination by treating you different from men in the department by
> sabotaging your careers, withholding funds from women, diverting women's
> funds to male colleagues, spreading false rumors about women, nominating less
> qualified men over women, not acknowledging efforts and contributions of
> women, not paying women for being Directors, physically intimidating and
> verbally demeaning women, and subjecting women to aggressive words and
> actions.

However, OIE stated it found insufficient evidence to continue an investigation, stating:

> Tulane's Office of Institutional Equity conducted a preliminary investigation and
> in consultation with the Chair for Faculty Grievance Committee (FGC) for the
> School of Medicine it was determined that there is insufficient information to
> support a finding of an Equal Opportunity Policy violation. As such, it is
> unnecessary to convene the FGC for further review and consideration of this

matter. Accordingly, this matter will be administratively closed and no further action/investigation into this matter will occur at this time. We have, nonetheless, shared your concerns with the Dean of the School of Medicine.

Dr. Saketkoo learned that the OIE did not reach out to several key witnesses she identified to OIE.

83.     The decision to terminate Dr. Saketkoo's employment was based on Dr. Lasky's reviews of her purported performance.

84.     Dr. Lasky reviewed Dr. Saketkoo's performance under higher and different criteria under which he reviewed her male peers. Had he reviewed her performance under the same criteria he reviews her male colleagues, Dr. Saketkoo would have received equal or better reviews.

85.     Dr. Lasky applied different standards when reviewing Dr. Saketkoo's performance because of her gender and because she complained to Tulane University and Tulane School of Medicine about his discrimination and gender-based harassment of her.

86.     Dr. Lasky and Dr. Hamm made the decision to terminate Dr. Saketkoo's employment.

87.     Dr. Lasky knew about these discrimination and harassment complaints because, *inter alia*, the Assistant Chair of the Department of Medicine relayed Dr. Saketkoo's complaints about Dr. Lasky's harassment and discriminatory conduct against her and other women faculty and staff in September 2018 to Dr. Lasky.

88.     Even after her employment with Tulane ended on June 30, 2019, Dr. Lasky continued to harass her by reaching out to third parties to try to have Dr. Saketkoo removed from

studies she was working on, removed from a co-director position of a treatment center she founded and from working at other hospitals in the capacity she was working prior to her wrongful termination.

FIRST CAUSE OF ACTION
GENDER DISCRIMINATION UNDER TITLE VII AS AGAINST TULANE SCHOOL OF MEDICINE AND TULANE UNIVERSITY

89.     Dr. Saketkoo repeats every allegation in the preceding allegations as if set forth in this cause of action.

90.     Dr. Saketkoo asserts this claim under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq*.

91.     Dr. Saketkoo, as a woman, belongs to a protected class protected under Title VII.

92.     Dr. Joseph Lasky discriminated against and harassed Dr. Saketkoo because of her gender, including terminating her employment.

93.     The conduct was sufficiently pervasive to alter the terms and conditions of her employment due to the frequency, the physical threats, and interference with her work.

94.     To the extent the Tulane School of Medicine and Tulane University have an anti-discrimination policy, it was ineffective to prevent the hostile work environment, making the defense under *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) inapplicable.

95.     As a direct and proximate result of defendants' unlawful and discriminatory conduct, Dr. Saketkoo has suffered and continues to suffer economic harm for which she is

28

entitled to an award of damages.

96.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Dr. Saketkoo has suffered and continues to suffer mental anguish and emotional distress for which she is entitled to an award of damages.

97.     Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of Title VII, for which Plaintiff if entitled to an award of punitive damages.

<u>SECOND CAUSE OF ACTION</u>
RETALIATION UNDER TITLE VII AS AGAINST TULANE SCHOOL OF MEDICINE AND TULANE UNIVERSITY

98.     Dr. Saketkoo repeats every allegation in the preceding allegations as if set forth in this cause of action.

99.     Dr. Saketkoo asserts this claim under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3.

100.     Dr. Saketkoo complained to the Tulane School of Medicine and Tulane University about Dr. Joseph Lasky's gender discrimination, harassment and assault of her and other women, thereby engaging in protected conduct.

101.     Dr. Lasky was aware of these complaints.

102.     In retaliation for those complaints, the Tulane School of Medicine and Tulane University has denied her opportunities for employment advancement and terminated her employment, constituting adverse employment action and ultimate employment decisions.

103.     The Tulane School of Medicine and Tulane University's decision to terminate her

29

employment under the pretext of productivity when, in fact, Dr. Lasky was retaliating against her for reporting instances of gender discrimination.

104.    A causal connection exists between the protected conduct and retaliatory acts.

THIRD CAUSE OF ACTION

HOSTILE WORK ENVIORNMENT UNDER TITLE VII AS AGAINST TULANE SCHOOL OF MEDICINE AND TULANE UNIVERSITY

105.    Dr. Saketkoo repeats every allegation in the preceding allegations as if set forth in this cause of action.

106.    Dr. Saketkoo asserts this claim under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq*.

107.    Dr. Lasky's harassment of Dr. Saketkoo was unrelenting, going far beyond a few isolated incidents. The frequency of his harassment heavily polluted the work environment to the point it destroyed the stability of the work environment for female employees, including Dr. Saketkoo.

108.    Dr. Lasky created an abusive work environment for women.

109.    Dr. Lasky's harassment was sufficiently severe and pervasive that it altered the conditions of Dr. Saketkoo's employment.

110.    Dr. Saketkoo was subject to Dr. Lasky's unwanted harassment.

111.    Dr. Lasky's harassment was based on Dr. Saketkoo's gender (female).

112.    Dr. Lasky's harassment affected terms, conditions and privileges of Dr. Saketkoo's employment.

113.    Tulane University and Tulane University Schoolf of Medicine knew of Dr. Lasky's harassment of Dr. Saketkoo and other women but did nothing to stop it.

<u>FOURTH CAUSE OF ACTION</u>
VIOLATIONS OF EQUAL PAY ACT AS AGAINST TULANE SCHOOL OF MEDICINE, TULANE UNIVERSITY, DR. LASKY AND DR. HAMM

114.    Dr. Saketkoo repeats every allegation in the preceding allegations as if set forth in this cause of action.

115.    Dr. Saketkoo asserts this claim under the Fair Labor Standards Act of 1938, as amended by the Equal Pay Act of 1963, 29 U.S.C. § 206(d).

116.    Tulane School of Medicine and Tulane University have discriminated against Dr. Saketkoo within the meaning of the EPA, 29 U.S.C. §§206, *et seq.* by providing her lower pay than similarly situated male colleagues on the basis of her gender, even though she performed similar duties requiring the same skill, effort and responsibility as her male colleagues who held comparable faculty positions in the Department of Medicine of the Tulane University School of Medicine.

117.    Tulane School of Medicine and Tulane University are employers within the meaning of the FLSA.

118.    Dr. Hamm is an employer within the meaning of the FLSA.

119.    Dr. Lasky is an employer within the meaning of the FLSA.

120.    Dr. Saketkoo and her male colleagues performed similar job duties and functions, which required the same skill, effort and responsibility.

31

121.    Dr. Saketkoo and her male colleagues performed under similar working conditions.

122.    Defendants discriminated against Dr. Saketkoo by subjecting her to discriminatory pay, violating the EPA.

123.    The difference in pay between Dr. Saketkoo and her male colleagues was not due to seniority, merit, quantity or quality of production, or a factor other than sex, but was due to gender.

124.    Defendants caused, attempted to cause, contributed to or caused the continuation of pay discrimination based on gender, violating the EPA.

125.    Defendants willfully violated the EPA within the meaning of 29 U.S.C. § 255(a). Because of these willful violations, a three-year statute of limitations applies to the violations under 29 U.S.C. § 255.

126.    Because of Defendants' willful violations, Dr. Saketkoo is entitled to all legal and equitable remedies, including lost earnings, liquidated damages, interest, attorneys' fees and expenses and other compensation under 29 U.S.C. § 216(b).

127.    Defendants are jointly and severally liable for EPA violations.

## FIFTH CAUSE OF ACTION
### GENDER DISCRIMINATION UNDER LOUSIANA STATUTE AS AGAINST ALL DEFENDANTS

128.    Dr. Saketkoo repeats every allegation in the preceding allegations as if set forth in this cause of action.

129.    The above acts and practices of the Defendant constitute unlawful discriminatory employment practices within the meaning of the Louisiana Employment Discrimination Law, La. R.S. 23:301 *et al*.

130.    Dr. Hamm is an employer within the meaning of the LEDL.

131.    Dr. Lasky is an employer within the meaning of the LEDL.

132.    Pursuant to requirements of La. R.S. 23:303(c), Dr. Saketkoo provided written notice to Defendants through her dual EEOC and Louisiana Commission on Human Rights Charge, which was filed in an attempt to amicably settle this matter to no avail.

133.    As a result of Defendants' acts, Dr. Saketkoo has suffered and will continue to suffer monetary damages and damages for mental anguish and humiliation unless and until this Court grants relief.

134.    Defendants are jointly and severally liable for the LEDL statutory violations..

SIXTH CAUSE OF ACTION
HOSTILE WORK ENVIORNMENT UNDER LOUSIANA STATUTE AS AGAINST ALL DEFENDANTS

135.    Dr. Saketkoo repeats every allegation in the preceding allegations as if set forth in this cause of action.

136.    Dr. Saketkoo, as a woman, belongs to a protected class protected under the LEDL.

137.    Dr. Saketkoo was subject to Dr. Lasky's unwanted harassment.

138.    Dr. Lasky's harassment was based on Dr. Saketkoo's gender (female).

139.    Dr. Lasky created an abusive work environment for women.

140.    Dr. Lasky's harassment of Dr. Saketkoo was unrelenting, going far beyond a few isolated incidents. The frequency of his harassment heavily polluted the work environment to the point it destroyed the stability of the work environment for female employees, including Dr. Saketkoo.

141.    Dr. Lasky's harassment was sufficiently severance and pervasive that it altered the conditions of Dr. Saketkoo's employment.

142.    The conduct was sufficiently pervasive to alter the terms and conditions of her employment due to the frequency, the physical threat, and interference with her work.

143.    Tulane University and Tulane University Schoolf of Medicine knew or should have known of Dr. Lasky's harassment of Dr. Saketkoo and other women but did nothing to stop it.

144.    Defendants are jointly and severally liable for the LEDL violations.

<u>SIXTH CAUSE OF ACTION</u>
ASSAULT UNDER LOUSIANA CIVIL CODE AS AGAINST DR. LASKY

145.    Dr. Saketkoo repeats every allegation in the preceding allegations as if set forth in this cause of action.

146.    Dr. Saketkoo asserts this cause of action under Lousiana Civil Code Article 2315.

147.    During the September 13, 2018 meeting, Dr. Lasky intentionally assaulted Dr. Saketkoo and put her in reasonable apprehension of receiving a battery.

148.    Dr. Joseph Lasky threatened Dr. Saketkoo with imminent physical harm and has

the physical ability to carry out the threat.

149.   As a result, Plaintiff suffered damages including emotional distress and mental anguish.

SEVENTH CAUSE OF ACTION
INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS UNDER LOUSIANA
COMMON LAW AS AGAINST DR. LASKY

150.   Dr. Saketkoo repeats every allegation in the preceding allegations as if set forth in this cause of action.

151.   Dr. Lasky engaged in a pattern of on-going harassment of and physically threatening acts against Dr. Saketkoo.

152.   Dr. Lasky harassed Dr. Saketkoo, at minimum, knowing it would cause her distress.

153.   Dr. Lasky, like other University staff, received anti-discrimination and harassment training. As her boss, he accordingly should have known his harassment of, physically threatening acts and discrimination against her would cause distress.

154.   No reasonable person could expect to endure Dr. Lasky's harassment and physically threatening conduct.

155.   Reflecting that no other reasonable person could expect to endure Dr. Lasky's harassment, other female University staff have quit or requested to be transferred because of his harassment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Dr. Saketkoo respectfully requests this Court grant the following relief:

a.     A declaratory judgment that the practices complained of herein are unlawful under Title VII, the EPA and La. R.S. 23:301 *et seq*., the Louisiana Employment Discrimination law and La. Code of Civil Procedure 2315;

b.     Enjoining and permanently restraining these Title VIII violations and requiring Defendants to implement a viable anti-discrimination policy and training for employees and supervisors to end gender-based harassment and discrimination which endangers female employee's safety and care;

c.     An award of compensatory damages and liquidated damages under the EPA;

d.     An award of back pay, front pay, punitive damages, emotional distress-baed damages, lost benefits, and other damages Dr. Saketkoo suffered to be determined at trial under Title VII and the LEDL;

e.     An award of punitive damages;

f.     An award of emotional distress-based damages;

g.     An award of prejudgment and post-judgment interest;

h.     An award of costs and expenses of this action together with reasonable attorneys' and expert fees; and

36

      i.     Such other and further relief as this Court deems just and proper.

DEMAND FOR TRIAL BY JURY

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff Dr. Saketkoo demands a trial by jury on all questions of fact the Complaint raises.

Dated:      New Orleans, Louisiana
              September 12, 2019

Respectfully Submitted,
VASQUEZ LAW OFFICE


/s/Jessica Vasquez
Jessica Vasquez (La #27124)
400 Poydras Street, Ste. 900
New Orleans, LA 70130
Tel: 504.571.9582
Fax: 504.684.1449
jvasquez@vasquezlawoffice.com

LIPSKY LOWE LLP


s/ Douglas B. Lipsky
Douglas B. Lipsky (Designated Trial Attorney, *pro hac vice* application forthcoming)
420 Lexington Avenue, Suite 1830
New York, New York 10170
Tel: 212.392.4772
Fax: 212.444.1030
doug@lipskylowe.com
*Attorneys for Plaintiff*