## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

LESLEY ANN SAKETKOO, MD, MPH                    CIVIL ACTION

VERSUS                                          No. 19-12578

TULANE UNIVERSITY                               SECTION I
SCHOOL OF MEDICINE, ET AL.

### ORDER & REASONS

Before the Court is defendant Administrators of the Tulane Educational Fund's ("Tulane") motion[1] for summary judgment on plaintiff Lesley Ann Saketkoo, MD, MPH's ("Saketkoo") remaining claims. Saketkoo opposes[2] the motion, and Tulane has filed a reply in response to Saketkoo's opposition.[3] For the reasons below, Tulane's motion is granted as to all of Saketkoo's remaining claims.

### I.      INTRODUCTION AND FACTUAL BACKGROUND

This case arises from Saketkoo's employment at Tulane University's School of Medicine (the "School"), interactions between her and a supervisor during her time at the School, the eventual non-renewal of her contract, and Tulane's alleged efforts to prevent her from obtaining employment after she left her paid role at the School. Saketkoo was first hired as an Associate Professor at the School for a one-year term commencing on December 1, 2014;[4] her contract was subsequently renewed for one-

---

[1] R. Doc. No. 127.
[2] R. Doc. No. 138.
[3] R. Doc. No. 144.
[4] R. Doc. No. 138-33.

year terms through 2019.[5]   Saketkoo was initially hired into the Allergy and Immunology Section at the request of its Chief, Dr. Laurianne Wild ("Wild"),[6] but transferred during 2017 to the Pulmonary Section ("Pulmonary"), headed by Dr. Joseph Lasky ("Lasky").[7]

The parties agree that Saketkoo has four claims remaining: an Equal Pay Act claim[8] and three claims under Title VII of the Civil Rights Act: gender discrimination,[9] retaliation, and hostile work-environment.   Saketkoo's claims arise primarily from her experience working with and for Lasky.   The record in this case is extensive, and the briefing is lengthy.[10]   For ease of reading and clarity, the Court

---

[5] *Id.*

[6] *Id.* at 3; *see* R. Doc. No. 138-5, at 2 (Wild's deposition testimony that she requested Saketkoo be hired).

[7] *See* R. Doc. No. 138-13, at 2 ¶ 3 (Saketkoo's declaration that the transition occurred because "[the Immunology Section] was not as facile in managing grants and funding" as Pulmonary); R. Doc. No. 149-1, at 6 (Tulane's assertion that Lasky "welcomed" Saketkoo to Pulmonary).

[8] In addition to the claims described here, Saketkoo has brought an Equal Pay Act claim.   As explained *infra*, the parties agree that Saketkoo cannot offer a substantive legal argument as to why this claim should not be dismissed.   Consequently, the Court does not address the claim and the facts supporting it further.

[9] Both parties refer to this claim as a claim of "Gender Discrimination," rather than disparate treatment.   Moreover, as discussed *infra*, the gender discrimination portion of Saketkoo's brief addresses only the non-renewal of her contract and offers no argument that any other action on Tulane's part was, itself, an adverse employment action.   The Court, therefore, understands Saketkoo's gender discrimination claim to relate only to the non-renewal of her contract.

[10] The Court notes that both parties have challenged the admissibility of at least some of the evidence submitted by each other.   The Court will resolve these disputes only where doing so is necessary to resolve the claims.

will limit its recitation of the facts to those necessary to resolve each of Saketkoo's claims.[11]

### Saketkoo's Interactions with Lasky

Saketkoo alleges that Lasky verbally abused her on numerous occasions and that, during one incident, he shook his finger at her in a way that made her fearful. She argues that this was gender-based because he treated her and other women this way but was not similarly abusive of men. She does not allege that he used gendered language with her or sexually abused her. In her opposition, relying largely on her own declaration and complaint,[12] Saketkoo describes five specific interactions with Lasky over the course of her time at Tulane that form the basis of her claim. She also states that "[i]n response to work-related questions, Lasky would frequently yell at and get close to [her] in a physically threatening manner, raising his finger in her face, demeaning statements [sic] such as 'stop it!  just [sic] stop it now!  Do you understand? Just stop it!'" She adds that she "repeatedly asked Lasky not to speak to her in that way and suggested that he needed to find other ways of communicating.

---

[11] In particular, both parties devote considerable attention to Saketkoo's evidence (much of which is hearsay) regarding Lasky's interactions with other women. As discussed *infra*, because this evidence alone cannot, by itself, support Saketkoo's otherwise deficient hostile work-environment claim, the Court will not review the admissibility of each piece of evidence.

[12] Except where noted, the Court will assume that these incidents occurred as described in Saketkoo's opposition. The Court notes, however, that Saketkoo's opposition relies heavily on her own declaration. The Fifth Circuit has repeatedly stated that "[s]elf-serving allegations are not the type of significant probative evidence required to defeat summary judgment." *See, e.g.*, *Kariuki v. Tarango*, 709 F.3d 495, 505 (5th Cir. 2013) (quoting *United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001)).

Lasky, however, persisted[,]" and that "Lasky's conduct impeded her ability to access meaningful job-related information."[13]   Saketkoo describes the incidents between her and Lasky as follows:[14]

> In late 2015, Saketkoo presented potential opportunities for improvements of patient care and revenue at the TMC Lung Center. Lasky angrily cut her off and[,] belittling her[,] said that it was "not her place" to discuss the needs of the Center.  Doing so, Lasky interfered with improvement upon the quality of care Saketkoo was able to provide to her patients.[15]

> On another occasion, in 2016, when Lasky and Saketkoo were convened in a small physician work room at Tulane clinics, she inquired about how funds from her pharmaceutical company sponsored trials would be applied to support her salary.  Lasky suddenly and frighteningly flew off the handle, with his arms flailing angrily towards her he yelled, "I'm sick of this!  All this questioning!  Do you think I'm cheating you?[]" Lasky's conduct was intimidating and made Saketkoo fearful.[16]

> In 2017, while in the clinic together, Saketkoo and Lasky were discussing a mutual patient.  Lasky was hovering over Saketkoo as she was documenting a patient's heart catheterization results.  Lasky had roughly calculated . . . an important value that determines that course of treatment for a patient . . . as a ballpark figure in his head.  Saketkoo began calculating the actual . . . value to properly document and to inform the treatment plan.  Lasky yelled at Saketkoo angrily: "What are you doing?  Stop it!  You don't need to calculate it, I already told you what it was!"  Lasky remained hovering over Saketkoo.  Saketkoo was too shocked and intimidated to continue the patient's calculation with Lasky so close in physical proximity.  She had to wait to complete her

---

[13] R. Doc. No. 150-1, at 21, 22.  The Court notes that, while Saketkoo cites her complaint as support for this allegation, she offers no support for the proposition that his conduct impeded her ability to access information.  The Court also notes that Tulane's memorandum in support of its motion identifies a few similar incidents (including an email telling Saketkoo to "take a bow" and instructions regarding scheduling and profanity in the workplace).  R. Doc. No. 149-1, at 24–25.  Saketkoo does not appear to rely on these, and they would not change the Court's analysis.

[14] As the Court concludes that the incidents, even assuming they occurred as Saketkoo says they did, are insufficient to make out a *prima facie* case, it need not determine whether her description of them is supported by the record.

[15] R. Doc. No. 150-1, at 21.

[16] *Id.* (citing Saketkoo's declaration).

duties when Lasky was not around. Lasky does not interfere with male physician's [sic] patient care or treat male faculty in this manner.[17]

In late Summer 2018, Lasky ridiculed research that Dr. Saketkoo was undertaking to study more efficient models of targeted muscle training . . . including the precise and fairly rapid conditioning that occurs in dance training. Lasky mockingly asked if Dr. Saketkoo had "danced away scleroderma." When Dr. Saketkoo started to explain the research to re-direct Lasky's aggression and condescension, Lasky interrupted Saketkoo harshly [sic] chided her, while pointing his finger at her: "We don't need you thinking! We need you working."[18]

[On] September 13, 2018, while Saketkoo and Lasky were walking to his office for a meeting together, Lasky berated Saketkoo for not informing him that she was teaching an honors undergraduate class at Tulane University . . . . Lasky exploded and moved close to her, red-faced, trembling and driving his pointed finger into her face yelling: "if I say I wasn't told about something, that's the end of it and I wasn't told about it!" . . . . Lasky was unrelenting and continued yelling at her as she stood speechless: "Do you understand? Stop it! You just stop it now! Stop it now!" Saketkoo began to slowly move away from him stating that she could not meet with him now. To assuage him, she promised to meet with him when he calmed down and collected himself. Lasky hollered that they had to meet "NOW!" Still gesturing with his pointed finger toward her face, Lasky continued, "we have things that need to be talked about!" Saketkoo was fearful of being physically hurt by Lasky. She tried to be calm as she moved further back from him and told him she would only meet with him now if his supervisor was also present.[19]

*Saketkoo's Response to Lasky's Conduct*

Saketkoo alleges that she complained about Lasky's abusive conduct and stood up to him during the September 13 incident. In her opposition, Saketkoo claims that she "dared to object and to refuse to continue to endure Lasky's harassment."[20] She

---

[17] *Id.* at 22 (unsupported).

[18] *Id.* at 23 (citing Lasky's deposition).

[19] *Id.* at 19 (citing Saketkoo's deposition).

[20] R. Doc. No. 150-4, at 30. The Court will again assume, except where noted, that these events occurred as set forth in Saketkoo's opposition, complaint, and declaration.

adds that she "did not cower to his physically threatening and discriminatory behavior."[21]   At no point in her opposition or her declaration does Saketkoo argue that her comments to Lasky indicated that she believed his conduct was discriminatory.   Saketkoo also argues that, immediately following the September 13 incident, Lasky began an active campaign to "divorce" his Section from Saketkoo.   As discussed *infra*, the Court will assume this is true, as it does not support a claim of retaliation.

Saketkoo also claims that, shortly after the incident, she "contacted [Tulane's Office of Institutional Equity ("OIE")] to complain about the toxic hostile environment and . . . specifically named Dr. Lasky on the call."[22]   She does not allege that, during that call, she suggested that Lasky's treatment of her occurred because of her sex.

In her opposition, Saketkoo also alleges that, during 2018, she "complained of Lasky's abuses" to Dr. Tonette Krousel-Wood, Dr. QiQi Zhou, and Dr. Laurianne Wild.[23]   She alleges in her declaration that she told Krousel-Wood that "Lasky was abusive and created a toxic work environment and was out of control" and that she "informed" Zhou "about Lasky's abusive treatment of me and the hostile work environment he created."[24]   She does not allege that during any of these conversations

---

[21] *Id.*   The Court notes that this statement in Saketkoo's opposition memorandum is followed by a call number for footnote 116 of the memorandum—a footnote that does not exist. *Id.*   The Court explicitly identified this issue in its October 22, 2020 Order imploring counsel to file a more helpful opposition memorandum. R. Doc. No. 146, at 1 n.5.   Nonetheless, the Court has combed Saketkoo's opposition and declaration for her description of this incident.

[22] R. Doc. No. 138-13, at 8 ¶ 35.

[23] R. Doc. No. 150-4, at 29.

[24] R. Doc. No. 138-13, at 7 ¶ 26.

she identified particular conduct that she believed was the result of her sex.  And, in a deposition, Saketkoo indicated that she did not "report the [September 2018] incident to . . . anyone in Tulane Administration until the OIE interview."[25]

Saketkoo offers more detail about her conversations with Wild, stating in her declaration that, following the September 13 incident, she "reported what [Lasky] did and his continuing abusive treatment, which I related to her on prior occasions."[26] She adds that, following her initial outreach to OIE, Wild "advised [her] not to pursue [her complaints against Lasky] with OIE, and instead to pursue alternate routes through the medical school 'chain of command'" lest she suffer retaliation.[27]

Finally, on February 15, 2019, Lee Hamm ("Dean Hamm"), the School's dean, informed Saketkoo that her contract as an Associate Professor would not be renewed for the coming year.[28]  The parties agree that, during the meeting, Saketkoo informed Dean Hamm of her belief that Lasky had discriminated against her and other women on the basis of gender and implored him to investigate the matter.[29]  Subsequently, Saketkoo participated in a formal investigation by OIE.[30]  Later, Saketkoo sought and received a right-to-sue letter from the EEOC.[31]

*Saketkoo's Performance at Tulane and Tulane's Non-Renewal of her Contract*

---

[25] R. Doc. No. 127-4, at 39.

[26] R. Doc. No. 138-13, at 8 ¶ 34.

[27] *Id.* at 9 ¶ 36.

[28] *See, e.g.*, R. Doc. No. 150-4, at 34–35 (referencing the termination meeting).

[29] R. Doc. No. 138-13, at 9 ¶ 37.

[30] *Id.* at 9 ¶ 38.  The parties dispute both how and when the investigation was initiated and whether it was adequately thorough.  Because the Court finds this issue immaterial, it will not address the dispute.

[31] *See* R. Doc. No. 1-6 (right-to-sue letter).

As noted above, Dean Hamm informed Saketkoo in February 2019 that her contract as an Associate Professor would not be renewed for the coming year.[32] Tulane claims that this decision was a result of its conclusion that Saketkoo was underperforming, difficult to work with, and did not do enough academic work to merit her retention despite her underperformance.

Saketkoo disagrees.  She argues, instead, that Tulane did not renew her contract (1) because she is a woman and (2) in retaliation for her opposition to Lasky's treatment of her.  She does not, however, identify a specific similarly situated individual whose contract was renewed.  Instead, she makes a number of claims that suggest her performance was evaluated differently than male physicians in Pulmonary or that Lasky otherwise interfered with her success.  The Court will address these arguments and Saketkoo's evidence (or lack thereof) *infra*.

### *Dean Hamm's Conversation with Dr. Nirav Patel regarding Saketkoo*

Saketkoo alleges that, in addition to retaliating against her for standing up to Lasky by not renewing her contract, Dean Hamm pressured Dr. Nirav Patel ("Patel") of University Medical Center ("UMC") not to take her on as a full-time employee following the 2019 non-renewal.  As evidence, Saketkoo has submitted a recording and transcript of a September 6, 2019 phone call between Saketkoo, Patel, and Dr. Matt Lammi.  During the recording,[33] Patel states that "if Dean Hamm comes and says Patel don't hire this person, this person explicitly . . . by name . . . you know

---

[32] *See, e.g.*, R. Doc. No. 150-4, at 34 (referencing the termination meeting).
[33] Tulane, while arguing that the recording is inadmissible, does not challenge its authenticity.  R. Doc. No. 149-2, at 3.

that's a pretty clear directive."[34]  Patel also suggests on the call that this happened during a meeting with Dean Hamm at some point after June 2019.[35]

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, a court determines that there is no genuine dispute of material fact.  *See* Fed. R. Civ. Proc. 56.  "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The party seeking summary judgment need not produce evidence negating the existence of a material fact; it need only point out the absence of evidence supporting the other party's case.  *Id.*; *see also Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195–96 (5th Cir. 1986) ("There is no sound reason why conclusory allegations should suffice to require a trial when there is no evidence to support them even if the movant lacks contrary evidence.").

Once the party seeking summary judgment carries that burden, the nonmoving party must come forward with specific facts showing that there is a genuine dispute of material fact for trial.  *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory

---

[34] R. Doc. No. 150-4, at 32 (Saketkoo's opposition).  Saketkoo has submitted this recording to the Court manually.
[35] *Id.*

allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence[.]" *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Rather, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . . the material may be presented in a form that would not, in itself, be admissible at trial." *Lee v. Offshore Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017) (citations omitted). The party responding to the motion for summary judgment may not rest upon the pleadings but must identify specific facts that establish a genuine issue. *See Anderson*, 477 U.S. at 248. The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255.

## III.   LAW AND ANALYSIS

As stated, Saketkoo brings three claims under Title VII: (1) gender discrimination, (2) retaliation, and (3) hostile work environment. Tulane concedes that her claims are administratively exhausted, and the parties agree that the *McDonnell Douglas* burden-shifting analysis applies to Saketkoo's claims.[36]   *See McDonnell Douglas Co. v. Green*, 411 U.S. 792 (1973). The Court will review each of Saketkoo's Title VII claims in turn.

---

[36] R. Doc. No. 150-1, at 11.

A.    Gender Discrimination

Saketkoo argues that, by not renewing her contract in February 2019, Tulane engaged in gender discrimination made unlawful under Title VII.   To survive summary judgment on this claim, she must put forth sufficient evidence to make a *prima facie* case that she (1) is a member of a protected class; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer;[37] and (4) was treated less favorably than—or was replaced by—other similarly situated employees outside the protected group.   *See McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007).

The parties agree that Saketkoo, a woman, is a member of a protected class. And Tulane does not appear to argue that Saketkoo has failed to establish that she was qualified for her position at Tulane.   And Tulane does not contest that non-renewal was an adverse employment action.[38]   However, the Court concludes that

---

[37] The only adverse employment action Saketkoo addresses in the context of her gender discrimination claim is Tulane's non-renewal of her contract.   Tulane's memorandum in support of the instant motion devotes a page to the argument that "the non-renewal of [Saketkoo's] annual contract" was "the only actionable adverse employment action pled."   R. Doc. No. 149-1, at 7–8.   Saketkoo's opposition ignores this argument in the context of the gender discrimination claim, instead resting on Tulane's concession that the non-renewal itself was an adverse employment action. *See* R. Doc. No. 150-1, at 12 ("It is undisputed that . . . Tulane rejected [Saketkoo] for [her] position by failing to renew her contract.   Tulane admitted that Saketkoo endured an adverse employment action.   As such, Saketkoo has established a *prima facie* case of gender discrimination[.]"); *see also id.* at 11 (explaining a plaintiff's burden to show "that he was qualified for the position in question and that he was rejected despite his qualifications").   And Saketkoo does not argue that any of the acts she cites as evidence that the non-renewal was discriminatory were, in and of themselves, actionable disparate treatment.
[38] R. Doc. No. 149-1, at 7 n.4.

Saketkoo has not made out a *prima facie* case that other similarly situated employees outside her protected class were treated more favorably. Because of this, the Court need not evaluate whether Tulane's proffered non-discriminatory reasons for the firing were pretextual.

Plaintiffs bringing Title VII discrimination claims using circumstantial evidence under *McDonnell Douglas*, 411 U.S. 792, must "identify at least one coworker outside of [their] protected class who was treated more favorably 'under nearly identical circumstances.'" *Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 426 (5th Cir. 2017) (quoting *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009)). This coworker is known as a 'comparator.' A failure to identify a potential comparator (*i.e.*, a similarly situated individual outside the protected class) "alone justifies dismissal of [a plaintiff's] Title VII claim." *Id.* at 427. If no such comparator exists, the plaintiff cannot establish a *prima facie* case. *See id.* (plaintiff who acknowledged that he was the only employee with a particular negative performance evaluation and to have been placed on a performance plan "cannot prove that he was treated less favorably than others 'similarly situated'").

"For a comparator to be deemed similarly situated, the employees being compared should 'h[o]ld the same job or responsibilities, share[] the same supervisor or ha[ve] their employment status determined by the same person and have essentially comparable violation histories.'" *Wallace v. Seton Family of Hospitals*, 777 F. App'x 83, 87–88 (5th Cir. 2019) (quoting *Lee*, 574 F.3d at 260) (footnotes omitted) (alterations in original). Moreover, "the plaintiff's conduct that drew the

adverse employment decision must have been 'nearly identical' to that of the proffered comparator who allegedly drew dissimilar employment decisions." *Id.* (quoting *Lee*, 574 F.3d at 260 (citation omitted)); *see Perez v. Tex. Dep't of Crim. Justice*, 395 F.3d 206, 213 (5th Cir. 2004) (finding that the district court erred by instructing the jury that "comparably serious misconduct was by itself enough to make employees similarly situated"). "However, 'nearly identical' should not be interpreted to mean 'identical.'" *Wallace*, 777 F. App'x at 87–88 (citing *Lee*, 574 F.3d at 260).

Tulane's position is that Saketkoo's contract was not renewed because "of numerous performance issues, including her sustained lack of productivity, diverting patients to competitor hospitals, causing disruption in clinic, and demanding she be given all patient referrals."[39]  In support of its motion, Tulane argued that Saketkoo's claim must fail at the comparator prong because she "cannot point to a single male physician with similar performance problems who was not treated the same as her (*i.e.*, whose contract was renewed)."[40]

Saketkoo's opposition to Tulane's motion ignores *McDonnell Douglas*'s 'comparator' requirement, stating that "[u]nder the *McDonnel Douglas* [sic] framework, Plaintiff bears the burden of proving a prima facie case of discrimination by a preponderance of the evidence by showing that he is a member of a protected class, that he was qualified for the position in question and that he was rejected despite his qualifications."[41]  Applying this framework, Saketkoo concludes that she

---

[39] R. Doc. No. 149-1, at 12–13.
[40] *Id.* at 13.
[41] R. Doc. No. 150-4, at 11.

has set forth a *prima facie* case because "[i]t is undisputed that [she]: (1) is a female and [a] member of a protected class; (2) qualified for the position as Tulane faculty in the School of Medicine; and (3) Tulane rejected her for the position by failing to renew her contract."[42]

In a section of her opposition titled "Evidence of Discriminatory Animus," Saketkoo raises arguments that appear to conflate or combine her gender discrimination, retaliation, and hostile work environment claims.[43] She notes that "Tulane claims Saketkoo lacks proof of similarly situated comparators [and] therefore[] . . . cannot establish discriminatory animus and her claims of discrimination fail."[44] However, Saketkoo argues, "the record establishes that Saketkoo was subjected to treatment disparate from that of her male counterparts-physicians within Lasky's Section."[45] She goes on to offer the following examples of disparate treatment—none of which are accompanied by any citation to the record:

- "Unlike Saketkoo, male physicians within Lasky's section were allowed to carry financial deficiencies and to continue their employment."[46]
- The male physicians' "research funds were included in their production reports."[47]
- "One of [Saketkoo's] male counterparts was allowed to move forward with a new research study when Saketkoo was not allowed to initiate an established one."[48]

---

[42] *Id.* at 12.

[43] Saketkoo's hostile work environment and retaliation claims, which fail for unrelated reasons, are discussed *infra*.

[44] R. Doc. No. 150-4, at 26.

[45] *Id.* Again, note that Saketkoo *does not argue* that these incidents of disparate treatment support an independent claim under Title VII.

[46] *Id.*

[47] *Id.*

[48] *Id.*

- "Saketkoo's male counterparts were not subjected to the ongoing gender bias and gender based hostile work environment that Saketkoo was forced to endure."[49]

Later, Saketkoo appears to argue that she need not identify comparators:

[T]o the extent that evidence of similarly situated employees is required—*which is again denied*—Saketkoo points to the evidence in the record establishing that her male counterparts were allowed to carry financial deficiencies and to continue their employment, her male counterparts' research funds were included in their production reports, her male counterpart was allowed to move forward with a new research study when she was not, her male counterparts were not subjected to the ongoing gender bias and gender based hostile work environment that she to which [sic] her female counterparts were subjected.[50]

In reply, Tulane argues that Saketkoo "completely ignores Tulane's argument on the comparator element of the *prima facie* case" and, consequently, has "abandoned any attempt to establish a *prima facie* case under Title VII."[51] Tulane also argues that Saketkoo's "'me too' evidence . . . is not sufficient to establish a *prima facie* case of discrimination or pretext."[52]

*Analysis*

As indicated in its previous order[53] denying Saketkoo's motion for leave to file a surreply, the Court declines to find that Saketkoo waived her gender discrimination claim by failing to correctly set forth and address the elements of a *prima facie* case. While Tulane is correct that the portion of Saketkoo's brief setting forth her *prima facie* case omits the comparator element, Saketkoo does, as set forth above, make

---

[49] *Id.*

[50] *Id.* at 27–28 (emphasis added).

[51] R. Doc. No. 149-2, at 3–4 (citing *Venezia v. ConocoPhillips Co.*, No. 12-2168, 2014 WL 107962, at *13 (E.D. La. Jan. 9, 2014) (Vance, J.)).

[52] R. Doc. No. 149-2, at 4.

[53] R. Doc. No. 148.

*some* argument suggesting (1) she does not need to show the existence of comparators[54] and/or (2) her comparators are male doctors in pulmonary who ran deficits and whose contracts were renewed after 2019.[55]  Furthermore, in attempting to demonstrate that Tulane's preferred non-discriminatory reasons for non-renewal are pretext, Saketkoo offers some evidence that *could* be construed as attempting to identify particular comparators.[56]

However, the Court finds that Saketkoo has failed to set forth a *prima facie* case of gender discrimination because she has failed to identify a similarly situated male who was retained by Tulane.  Saketkoo's argument that comparators exist— construed *very* generously—can be distilled to the proposition that some male (and female) physicians in Pulmonary, at times, ran deficits and were retained.  As the Court has noted, employees with different titles from plaintiff *can* be comparators for purposes of Title VII.  However, Saketkoo has offered no explanation as to why the male physicians within Lasky's section who are not Associate Professors—a group that includes Lasky himself—are suitable comparators.  It is Saketkoo's burden to offer *some* argument on this point, and she fails to do so.

Saketkoo also fails to identify a male Associate Professor in Pulmonary who is similarly situated to her and was retained.  Setting aside the fact that (as explained

---

[54] Saketkoo offers the Court no explanation or case law to suggest that this is so.  R. Doc. No. 150-4, at 28.  Therefore, as dictated by the clear precedent cited above, the Court concludes that Saketkoo, like any other plaintiff in her position, must identify comparators who are sufficiently similarly situated to her.

[55] *Id.* at 26, 27–28.

[56] *See, e.g.*, *id.* at 12 ("Saketkoo's performance was superior to that of several male physicians.").

*infra*) Saketkoo's argument has significant factual shortcomings, the argument does not (1) identify any particular individual and (2) establish that they are sufficiently similarly situated to Saketkoo to be a comparator. Saketkoo does not name an Associate Professor in Lasky's section (or elsewhere at Tulane, for that matter) who underperformed to the extent she did year after year and was retained. Instead, she offers some metrics that she claims suggest these doctors underperformed in a given year in some of the same ways that Tulane claims she did. At no point, however, does she identify a comparator, describe how they are similarly situated, and confirm that they were retained year after year when she was not. For example, Saketkoo is silent as to any other ways in which a particular male Associate Professor might be similarly situated (or not) to her besides having been projected to run a deficit.

Saketkoo does make three statements that could be construed as identifying particular individuals and drawing a relevant comparison. They relate to (1) a male physician who was allegedly allowed to conduct a study; (2) male physicians who were allegedly given credit for research work where she was not; and (3) male physicians who were allegedly allowed to run planned deficits when she was not.

First, Saketkoo references a male physician in her section who Lasky "allowed to move forward with a new research study when Saketkoo was not allowed to initiate an established one."[57] This appears to be a reference to an incident described in the section of Saketkoo's opposition addressing her hostile work-environment claim.[58]

---

[57] *Id.* at 26. This appears from Saketkoo's declaration to be Dr. Nathan Nielsen.
[58] *Id.* at 22.

There, citing her own declaration, Saketkoo describes Lasky's refusal to allow her to enroll patients in an "advanced sarcoidosis registry," which would have brought "the Section . . . $1,500 for every two patients enrolled."[59] Saketkoo compares this to Lasky's decision to "allow[] a male faculty member to move forward with a study he proposed even though that study lacked IRB approval."[60] Saketkoo offers no other information about the accepted study. Setting aside the question of the evidentiary value of a self-serving declaration, Saketkoo's declaration does not indicate that Lasky barred her from starting a study—nor that Lasky allowed the other doctor to enroll patients. Instead, it says that she "brought the study to [Lasky] for his approval" in the "end of 2017."[61] Only "[i]n the spring of 2018, when the study was ready to enroll patients," did Lasky "park[] it."[62] Presumably, had Lasky rejected the study outright, there would have been no reason for Saketkoo to seek permission to enroll patients. And the declaration makes no mention of Nielsen enrolling patients. Instead, it explicitly notes that his study would not be "ready for patient enrollment for many months."[63]

And even if Saketkoo offered adequate evidence that Nielsen had been allowed to enroll patients in his study, Saketkoo offers the Court no way to tie that to the adverse employment action the parties agree she experienced—her non-renewal. She does state that, had she been allowed to enroll patients, the "funding could have been

---

[59] *Id.*

[60] *Id.*

[61] R. Doc. No. 138-13, at 4 ¶ 15.

[62] *Id.*

[63] *Id.*

used to support [her] salary."[64]  However, she has not alleged (nor pointed the Court to any evidence) that funding from Nielsen's study was used to support his salary— and such evidence would be surprising in light of Saketkoo's assertion that Nielsen's study was not nearly ready for patient enrollment.  For these reasons, among others, the incident with Nielsen's study does not render him a comparator.

Second, Saketkoo explains that male physicians in Pulmonary had their "research funds . . .  included in their production reports."[65]  Elsewhere in her opposition, Saketkoo states that "Lasky failed to account for [her] research funds" and that "[t]his is critical because the research funds . . . should have been" taken into account when evaluating her financial performance.[66]  In support of her statement that Lasky failed to take into account her research funds, she cites a statement in Lasky's deposition, which she describes in a footnote as his "admi[ssion that] Saketkoo did not get salary support for her efforts on research study [sic]" in 2015 and 2016.[67]  In the referenced excerpt of Lasky's deposition, he acknowledges that, while in Immunology during 2015 and 2016, and when she first arrived in Pulmonary, Saketkoo "did not get salary support . . . for [a] BI study" and that the study was "a sponsored study that would give her actual income for her salary support."[68]  However, Lasky also noted that during the majority of the time during which Saketkoo did not receive salary support, there was uncertainty regarding

---

[64] *Id.*

[65] R. Doc. No. 150-4, at 26.

[66] *Id.* at 12.

[67] *Id.* at 13 n.56.

[68] R. Doc. No. 138-30, at 9.

patient enrollment and that, after she moved to Pulmonary, he "caught that [she was not receiving credit for the study] and . . . addressed it," ensuring that she received credit.[69]

Saketkoo's comparators would logically be male physicians in Pulmonary.  But her complaint regarding the BI study relates mainly to her time in Immunology—she does not rebut Lasky's statement that he recognized she should have received credit for the BI study after her arrival in Pulmonary and credited her for it.  More importantly, one of her two budget worksheets from her time in Pulmonary indicates that she *did* receive credit for a research study—*a point her opposition acknowledges*.[70]  By way of comparison, she offers the worksheets of three male doctors in Pulmonary.[71]  Two of these doctors, Doctor 138 and Doctor 211, were Assistant Professors in the Pulmonary Department during 2016–2017.  The third, Doctor 146, is the Section Chief, Lasky.  As Section Chief, Lasky has significant supervisory responsibilities—not only was his work different from Saketkoo's, but part of his role was to supervise her.[72]  He is an inappropriate comparator.  *See West v. City of Houston*, 960 F.3d 736, 741 (5th Cir. 2020) (noting that differing job

---

[69] *Id.*  Saketkoo does not suggest this is inaccurate.

[70] R. Doc. No. 150-4, at 13 n.58 (opposition); R. Doc. No. 138-6, at 19 (Saketkoo's 2018 worksheet).

[71] R. Doc. No. 150-4, at 13–14 n.58 (citing R. Doc. No. 138-6, 23–24, 29).  The Court notes that these citations are to redacted pages of an unsealed exhibit and treats them as references to R. Doc. No. 138-28, an unredacted copy of the exhibit.

[72] Indeed, Saketkoo's Title VII retaliation claim includes, among other things, a 'cat's paw' theory of causation relying on her assertion that Lasky used his supervisory role to make her work performance appear inadequate when reviewed by Dean Hamm and the School's leadership.  *Id.*

responsibilities are a factor to compare in evaluating comparators).  The other two physicians also held different job titles from Saketkoo, though that does not always preclude an employee from being an appropriate comparator.  *See Turner v. Kansas City S. Ry. Co.*, 675 F.3d 887, 896 (5th Cir. 2012) (finding railroad conductor was appropriate comparator for engineer because, despite different job titles, there was no evidence that their responsibilities were different regarding the conduct for which they were being disciplined).  However, Saketkoo has offered the Court no explanation as to why these individuals, despite their disparate job titles and presumably different responsibilities, are appropriate comparators. And even if she had, she also fails to explain how these physicians were treated differently than she was.  Each of their worksheets reflects, as Saketkoo acknowledges, a single "5 ledger account" reflecting salary credit for a research study.[73]  As noted above, one of Saketkoo's worksheets from her time in the pulmonary section *also includes a 5 ledger account.*

To summarize, Saketkoo has failed to demonstrate that (1) these physicians with different job titles were similarly situated to her; (2) they had research studies credited where she did not; and (3) if they had, there is a connection between this and her non-retention.

Finally, the Court will address Saketkoo's statement that "male physicians within Lasky's section were allowed to carry financial deficiencies and to continue

---

[73] R. Doc. No. 138-28, at 23 (Dr. 138); *id.* at 29 (Dr. 211).

their employment."[74]   Elsewhere in her opposition, Saketkoo alleges that her "performance was superior to that of several male physicians who were not terminated" and that "about half of the doctors in the pulmonary section were," like her, "carrying deficits."[75]  To support this, she cites an excerpt of the deposition of Susan Pollock, a Rule 30(b)(6) representative of Tulane, who acknowledged that some of the doctors in the department carried deficits and others did not, adding that "it's very specific to the provider."[76]  She also cites the 2016 and 2017 worksheets of fourteen doctors.[77]  These worksheets were used by Tulane and its physician employees to plan for and review their financial performance.[78]

The 2016 worksheets suggest three male doctors in Pulmonary had planned deficits for the year—none of whom shared Saketkoo's Associate Professor title.[79] The 2017 worksheets suggest that one male Associate Professor was projected to run a deficit that year—Doctor 243.[80]  These records do not provide evidence that a suitable comparator exists, let alone one who did not suffer a similar adverse employment action as Saketkoo.

---

[74] R. Doc. No. 150-4, at 26.

[75] R. Doc. No. 150-4, at 12, 12 n.49.  The Court notes that this group includes female physicians.

[76] R. Doc. No. 138-28, at 11.

[77] R. Doc. No. 138-28, at 20–33 (2016 worksheets); R. Doc. No. 150-6 (2017 worksheets).

[78] R. Doc. No. 150-4, at 12–13.

[79] R. Doc. No. 138-28, at 20–33.

[80] R. Doc. No. 150-6, at 14.

First, Doctor 243 was not projected to run a deficit in 2016[81] —this alone seems fatal to the comparison. Second, even if he was, Saketkoo offers no further details about him to suggest that his responsibilities, disciplinary record, and historical financial performance are "nearly identical" to hers. *See Turner*, 675 F.3d at 893 ("[T]he plaintiff must show that . . . employees who were not members of the plaintiff's protected class were treated differently under circumstances 'nearly identical' to [hers]." (quoting *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995)). Third, Saketkoo did not join Pulmonary for budget and supervisory purposes until midway through 2017[82]—and Tulane renewed her contracts through June 2019, almost two years later. Saketkoo offers the Court no information about Doctor 243's projected or actual performance for the two years prior to the non-renewal of her contract. And she offers the Court no information about the circumstances of his employment.

The Court has made every effort to glean information about possible comparators from plaintiff's briefing. But there is simply not enough to support a *prima facie* case. The Court notes that Saketkoo offers an extensive argument seeking to characterize Tulane's stated non-discriminatory reasons for her non-renewal as pretext.[83] Because the Court does not find that Saketkoo has made out a *prima facie* case of gender discrimination, it does not evaluate Tulane's stated

---

[81] R. Doc. No. 138-28, at 31.
[82] R. Doc. No. 138-13, at 2 ¶ 3.
[83] *See generally* R. Doc. No. 150-4, at 12–17 (responding to Tulane's stated non-discriminatory reasons).

23

reasons.  To the extent Saketkoo calls into question Tulane's methods of evaluating her performance or the conclusions it reached, this does not obviate the need to identify a comparator.

## B.   Retaliation

Saketkoo alleges that Tulane retaliated against her because she engaged in Title VII protected activity by (1) "complain[ing] of Lasky's abuses" to three Tulane supervisors and OIE in 2018;[84] (2) "st[anding] up" to Lasky after the September 13, 2018 incident;[85] and (3) filing a formal OIE complaint in 2019.[86]  She argues that, as a result, she suffered two adverse employment actions—Tulane's decision not to renew her contract and alleged pressure exerted by Dean Hamm on Patel, the Chief Medical Officer of UMC, where Saketkoo sought continued employment in 2019.[87] And she alleges that, based on a cat's paw theory of causation, Lasky's intent to retaliate following the September 2018 incident provides a suitable causal link between her protected activity and the adverse employment actions.[88]

Tulane concedes that Saketkoo engaged in protected activity during the non-renewal meeting in February 2019 and that the non-renewal itself was an adverse employment action.[89]  It argues, however, that this cannot support a retaliation claim because the adverse employment action predates the protected activity.[90]  It also

---

[84] *Id.* at 29.
[85] *Id.* at 30.
[86] *Id.* at 31.
[87] *Id.*
[88] *Id.* at 31, 36–40.
[89] R. Doc. No. 149-1, at 3.
[90] *Id.*

argues that (1) none of the other reports Saketkoo described constitute protected activity and (2) the evidence belies Saketkoo's description of the call from Dean Hamm to Patel, which, in any event, cannot constitute protected activity.[91]

To state a Title VII retaliation claim using circumstantial evidence,[92] "[a] . . . plaintiff must establish that (1) the employee engaged in activity protected by Title VII; (2) the employer took adverse employment action against the employee; and (3) a causal connection exists between that protected activity and the adverse employment action." *Fisher v. Lufkin Indus., Inc.*, 847 F.3d 752, 757 (5th Cir. 2017) (citing *Zamora v. City of Houston*, 798 F.3d 326, 331 (5th Cir. 2015)); *see Parker v. Louisiana Dept. of Educ. Special Sch. Dist.*, 323 F. App'x 321, 327 (5th Cir. 2009) (applying *McDonnell Douglas* framework).

As explained below, the Court concludes that Saketkoo fails to state a *prima facie* retaliation claim. Tulane concedes that Saketkoo's 2019 report was protected activity. And her non-renewal, as well as any attempt by Dean Hamm to dissuade UMC from hiring Saketkoo, are plausibly adverse employment actions. However, Saketkoo fails to establish a causal link between her protected activity and the adverse employment actions she suffered.

*Activity Protected by Title VII*

"Under Title VII's antiretaliation provision, protected activity can consist of either: (1) 'opposing any practice made an unlawful employment practice by [Title

---

[91] R. Doc. No. 149-2, at 3.
[92] Saketkoo acknowledges that this standard applies. *See* R. Doc. No. 150-4, at 29 (applying it to her claims).

VII]' or (2) 'making a charge, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing under [Title VII].'" *EEOC v. Rite Way Serv., Inc.*, 819 F.3d 235, 239 (5th Cir. 2016) (quoting 42 U.S.C. § 2000e–3(a)) (alterations omitted and added).  The first of these prongs is known as the 'opposition clause;' the second is known as the 'participation clause.'[93]  *See id.*

The Fifth Circuit has repeatedly held that the opposition clause does not actually require the opposed conduct to, in fact, violate Title VII.  Instead, it is "enough that [the plaintiff] reasonably believed the employment practice to be unlawful."  *Id.* at 240 (citing *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1137–40 (5th Cir. 1981)); *see Cuellar v. Southwest General Emergency Physicians, P.L.L.C.*, 656 F. App'x 707, 710 (5th Cir. 2016) (per curiam) ("[A] viable Title VII retaliation claim does not necessarily depend on a viable harassment or discrimination claim." (emphasis omitted)).  While the reasonable belief standard is "in tension with the plain text" of the statute, *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 401 n.2 (5th Cir. 2013), it "remains good law."  *Rite Way*, 819 F.3d at 240.

The Supreme Court has stated that "[t]he term 'oppose,' being left undefined by the statute, carries its ordinary meaning: 'to resist or antagonize[;] to contend against; to confront; resist; withstand[.]'"  *Crawford v. Metropolitan Gov't of Nashville*

---

[93] The Fifth Circuit has noted with approval that every Circuit faced with a participation clause argument has concluded that "participation in an internal employer investigation not connected with a formal EEOC proceeding does not qualify as protected activity under the participation clause."  *Rite Way*, 819 F.3d at 239 n.2 (quoting *Townsend v. Benjamin Enters., Inc.*, 639 F.3 41, 49 (2d Cir. 2012)).

*and Davidson Cty.*, 555 U.S. 271, 276 (2009) (quoting Webster's New Int'l Dictionary 1710 (2d ed. 1957)) (internal citations and alterations omitted).  While "neither the Supreme Court nor the Fifth Circuit have ruled definitively" regarding the extent to which informal complaints can constitute opposition, *Brandon v. Sage Corp.*, 61 F. Supp. 3d 632, 648–49 (W.D. Tex. 2014), the Fifth Circuit has indicated that, in some circumstances, "[a]n informal complaint to a supervisor regarding an unlawful employment practice may satisfy the opposition" clause. *Tureaud v. Grambling State Univ.*, 294 F. App'x 909, 914–15 (5th Cir. 2008) (per curiam).[94]  However, the opposition must indicate that the plaintiff views the employment practice as discriminatory. *Breeding v. Dep't of Interior*, No. 14-948, 2015 WL 1809977, at *8 (E.D. La. Apr. 21, 2015) (Africk, J.) (finding that opposition clause was not satisfied where plaintiff did not explain how her opposition "implicated her protected status or how a 'reasonable employer would have understood [it] to be an expression of opposition *to unlawful discrimination* at work'" (emphasis retained) (quoting *Stewart v. RSC Equip. Rental, Inc.*, 485 F. App'x 649, 652 (5th Cir. 2012))); *see also Stewart*, 485 F. App'x at 652 (affirming summary judgment as to allegation of retaliation because plaintiff's opposition to discrimination was 'indistinguishable from non-race-based grumbling by an employee' and 'had no racial element'); *Allen v. Envirogreen Landscape Professionals, Inc.*, 721 F. App'x 322, 326 (5th Cir. 2017) ("In a claim of

---

[94] In *Tureaud*, the Fifth Circuit explicitly stated that it "need not decide the outer limit of protected activity under the opposition clause in order to resolve this case." *Id.* at 915 n.2.  Because the Court concludes that Saketkoo's complaints are insufficient for other reasons, it will assume that their informal nature is not dispositive.

protected opposition, an employee must at least have referred to conduct that could plausibly be considered discriminatory in intent or effect, thereby alerting the employer of its discriminatory practices."). Complaints about a 'hostile work environment' or 'unfair treatment' must give the employer some notice of how the conduct is discriminatory. *See Tratree v. BP N. Amer. Pipelines, Inc.*, 277 F. App'x 390, 395 (5th Cir. 2008) (per curiam) (stating that, in the ADEA context, where the Fifth Circuit "uses the same standards of proof . . . as it does for Title VII[,] . . . [c]omplaining about unfair treatment without specifying why the treatment is unfair . . . is not a protected activity"); *Harris-Childs v. Medco Health Solutions, Inc.*, 169 F. App'x 913, 916 (5th Cir. 2006) (per curiam) (upholding grant of summary judgment on retaliation claim where, "[i]n her appellate brief, Appellant [did] not allege that she specifically complained of racial or sexual harassment, only harassment").

Assuming arguendo that Saketkoo reasonably believed Lasky's verbal abuse was unlawful, her immediate reaction to his outburst on September 13, 2018 gave no indication of this. This forecloses the possibility that her response is protected.[95] Saketkoo has not suggested that she said anything to Lasky indicating she thought his conduct was discriminatory—or even gender-based. Complaints about a 'hostile

---

[95] Moreover, Saketkoo's opposition to the motion casts doubt upon the notion that Lasky's conduct on September 13 had anything to do with her gender. In her memorandum, Saketkoo speculates that "Lasky's anger likely emanated from an email from his supervisor . . . QiQi Zhou, M.D. ("Zhou"), advising that Saketkoo had inquired about the calculation of her revenues and Lasky's accounting thereof." R. Doc. No. 150-4, at 20. Anger expressed in non-gendered terms about an email to a supervisor's supervisor does not support a Title VII claim. *See West*, 960 F.3d at 743 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)) ("Title VII does not impose a 'general civility code' on employers.").

work environment' or 'unfair treatment' must give the employer some notice of how the conduct is discriminatory. *See Tratree*, 277 F. App'x at 395; *Harris-Childs*, 169 F. App'x at 916.

Saketkoo's initial outreach to OIE is similarly unprotected. Though she offers as evidence an email from the OIE administrative secretary confirming that a call occurred, she does not allege (nor offer evidence to suggest) that she indicated during the call that she viewed the incident as discriminatory.[96] Therefore, much like Saketkoo's initial 'protest' to Lasky, this is not protected activity.

The Court will assume arguendo that Krousel-Wood and Zhou were Saketkoo's supervisors, meaning that the opposition clause could conceivably apply to her statements to them. However, assuming these conversations occurred as Saketkoo claims they did, they are still unprotected.[97] During her deposition, Saketkoo indicated that she told Krousel-Wood that Lasky was "out of control" and "not approachable."[98] She added that she "might have even said something to the effect that it was oppressive."[99] In the same disposition, Saketkoo stated that she "saw [Zhou] in the hall" and told her "things . . . in this section" were "untenable" and

---

[96] *See* R. Doc. 138-13, at Ex. 1.
[97] The Court notes that Saketkoo also offers no plausible causal link between these conversations and Saketkoo's non-renewal nearly five months later. While she alleges that Dr. Wild dissuaded her from proceeding further with her complaint, she does not allege that OIE, Krousel-Wood, or Zhou had any discriminatory animus towards her or communicated her report to Lasky, who then acted on it. *Id.* at 9 ¶ 36.
[98] R. Doc. No. 127-4, at 40.
[99] *Id.*

"abusive."[100]  Neither of these statements offers any indication that Saketkoo believed she was experiencing gender-based discrimination—it is hard to understand how they could have given Tulane notice of this belief.  Simply put, the statements lack the level of specificity required for the opposition clause to be triggered.

Saketkoo offers more detail about her conversations with Wild (her former supervisor in Immunology),[101] stating in her declaration that following the September 2018 incident she "reported what [Lasky] did and his continuing abusive treatment, which I related to her on prior occasions."[102]  She adds that, following her initial outreach to OIE, Wild "advised her not to pursue [her complaints against Lasky] through OIE, and instead to pursue alternate routes through the medical school 'chain of command'" lest she suffer retaliation.[103]  However, when asked during her deposition if she had reported the September 2018 incident to anyone in Tulane administration prior to her interview with OIE, Saketkoo confirmed that she had not.[104]  In this respect, then, her deposition testimony appears at odds with her sworn declaration.  More importantly, though, neither statement indicates that she shared with Wild her belief that she was being discriminated against.  The conversation, to the extent it happened, was unprotected.

---

[100] *Id.*

[101] It is unclear how the opposition clause might apply to any conversation with Wild, who was indisputably neither Saketkoo's supervisor in late 2018 nor her harasser.

[102] R. Doc. No. 138-13, at 8 ¶ 34.

[103] *Id.* at 9 ¶ 36.

[104] R. Doc. No. 127-4, at 40.

The Court will also assume, as Tulane does, that Saketkoo's comments during the February 15, 2019 non-renewal meeting and her OIE complaint based on the same constitute protected activity.

*Adverse Employment Action*

In the context of a retaliation claim, unlike that of a discrimination claim, Title VII "does not confine the actions and harms it forbid to those that are related to employment or occur at the workplace." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 57 (2006). In *White*, the Supreme Court explicitly rejected the Fifth Circuit's "ultimate employment decision" standard, "which limit[ed] actionable retaliatory conduct to acts such as hiring, granting leave, discharging, promoting, and compensating." *Id.* at 60, 67 (internal quotations and alterations omitted). Instead, *White* held, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (internal quotation omitted); *see also id.* at 69 (adding that the standard is phrased "in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances"). Courts in the Fifth Circuit have concluded that "a negative reference may constitute an adverse employment action." *Levitz v. Alicia's Mexican Grille, Inc.*, No. 19-3929, 2020 WL 710013, *3 (S.D. Tex. Feb. 11, 2020).

The parties agree that Tulane's non-renewal of Saketkoo's contract was an adverse employment action. Saketkoo alleges that Tulane also retaliated against her

by dissuading Patel, UMC's Chief Medical Officer, from hiring her.[105]   Tulane does not dispute the authenticity of the recording.  However, it argues that the claim is a "non-starter" because Saketkoo relies on Patel's hearsay statement and because Dean Hamm and Patel both testified under oath that Dean Hamm did not tell Patel not to hire Saketkoo.[106]   In his affidavit, Patel states that "Dean Hamm did not at any time tell me not to hire Dr. Saketkoo, nor did he ever request that I not hire her."[107]   However, he acknowledges that, during the recorded conversation, he "made statements that implied that Dean Hamm told me not to hire Dr. Saketkoo."[108]

"Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . . the material may be presented in a form that would not, in itself, be admissible at trial." *Lee v. Offshore Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017) (citations omitted) (alteration in original).

Regardless of whether the recording itself is ultimately admissible,[109] Saketkoo could likely introduce evidence of Patel's statement—perhaps by calling him to the stand.  But even if she could not, Tulane has submitted a sworn affidavit from Patel acknowledging that he made comments to Saketkoo suggesting that

---

[105] R. Doc. No. 150-4, at 31–32.

[106] R. Doc. No. 149-2, at 3 (citing R. Doc. No. 127-14 (Patel Affidavit); R. Doc. No. 127-7 (Dean Hamm Deposition)).

[107] R. Doc. No. 127-14, at 2 ¶ 3.

[108] *Id.* at 2 ¶ 6.

[109] It is at most one level of hearsay (the recording); Patel's underlying statement that 'Dean Hamm told me X' is not offered by Saketkoo as evidence of the truth of anything, but rather as evidence that Dean Hamm made the statement.

Tulane had instructed him to turn Saketkoo away.[110]  And Tulane offers no argument that the affidavit is inadmissible.

Tulane does offer evidence (Dean Hamm's deposition and Patel's own affidavit) that Patel was lying when he spoke to Saketkoo and Lammi.  But the Court is obliged, at the summary judgment stage, to resolve factual disputes in favor of Saketkoo, the non-movant, where it is justifiable to do so.  *See Anderson*, 477 U.S. at 255.  There is, at the very least, a dispute of material fact as to whether an adverse employment action occurred.

*Causal Link*

While a plaintiff pursuing a retaliation claim is required to "establish that . . . her protected activity was a but-for cause of the alleged adverse action" suffered, *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013), "the but-for standard does not apply at the *prima facie* case stage."  *Brown v. Wal-Mart Stores East, L.P.*, 969 F.3d 571, 577 (5th Cir. 2020) (quoting *Garcia v. Pro. Cont. Servs., Inc.*, 938 F.3d 236, 242 (5th Cir. 2019)); *see Garcia*, 938 F.3d at 242 (describing as "binding circuit law" the statement that "*Nassar* did not alter the causation prong of the *prima facie* stage of retaliation analysis" (internal quotation and citation omitted)).  Instead, to satisfy the third element of a *prima facie* retaliation case, a plaintiff need only offer evidence "demonstrat[ing] that the decision maker had knowledge of the protected activity."  *See Tureaud*, 294 F. App'x at 914 (finding that evidence supported jury

---

[110] R. Doc. No. 127-14.

verdict on retaliation claim and that a jury could reasonably infer that the decision maker had knowledge of his assistant's conversation with plaintiff).

If the protected activity and the adverse employment action are "very close" in time, that alone may establish a *prima facie* causal link. *See Thompson v. Somervell Cty.*, 431 F. App'x 338, 342 (5th Cir. 2011) (citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam). However, "even at the *prima facie* stage, temporal proximity can only establish a causal link when it is connected to the decision maker's knowledge of the protected activity." *Id.* (citing *Breeden*, 532 U.S. at 273; *Cothran v. Potter*, 398 F. App'x 71, 73–74 (5th Cir. 2010) ("The combination of temporal proximity and knowledge of a protected activity may be sufficient to satisfy a plaintiff's *prima facie* burden for a retaliation claim[.]"); *Ramirez v. Gonzales*, 225 F. App'x 203, 210 (5th Cir. 2007) ("Fifth Circuit precedent requires evidence of knowledge of the protected activity on the part of the decision maker and temporal proximity between the protected activity and the adverse employment action.")). While the Supreme Court has indicated that a three-month gap is insufficient to show causation, *Breeden*, 532 U.S. at 273–74, the Fifth Circuit has since held that two-and-a-half months is close enough to "establish causation." *Garcia*, 938 F.3d at 243.

The Fifth Circuit has held that the "cat's paw analysis remains [a] viable" theory of causation for retaliation claims. *Zamora*, 798 F.3d at 332–33. Under a cat's paw theory of causation, a plaintiff may offer, in lieu of evidence of the decision maker's retaliatory intent, evidence "show[ing] that the person with retaliatory animus used the [decision maker] to bring about the intended retaliatory action." *Id.*

at 332; *see Haire v. Bd. of Supervisors of La. State Univ. Agric. and Mech. Coll.*, 719 F.3d 356, 369 (reversing grant of summary judgment on plaintiff's retaliation claim finding adequate evidence to support a cat's paw theory). A plaintiff seeking to rely on a cat's paw theory of causation must demonstrate that "(1) her supervisor, motivated by retaliatory animus, took action intended to cause an adverse employment action; and (2) that action was the but-for cause of her adverse employment action."[111] *Brown*, 969 F.3d at 577.

Saketkoo offers no evidence of any causal link between her protected activity and Dean Hamm's meeting with Patel in the summer of 2019. On his call with Saketkoo, Patel suggests that Dean Hamm told him not to hire Saketkoo at some point after June 2019. Even if the conversation occurred on July 1, this is too far removed from the February 2019 meeting and Saketkoo's subsequent OIE report for temporal proximity to establish a causal link supported only by Dean Hamm's knowledge of Saketkoo's protected activity. *See, e.g.*, *Thompson*, 431 F. App'x at 342. And Saketkoo does not explain or offer any evidence of how Lasky brought about the meeting between Dean Hamm and Patel, or how that action was a but-for cause of the meeting. Therefore, her cat's paw theory cannot provide a causal link.

---

[111] Because the Court concludes that Saketkoo's 'standing up' to Lasky in September 2018—the only action directed at Lasky that Saketkoo claims was protected—is not protected activity, Lasky's animus towards Saketkoo is irrelevant for purposes of this analysis. Whatever animus he had towards her apparently arose from his difficulties in working with her, which do not implicate Title VII.

Nor does she argue (despite being invited to brief the issue)[112] that the Court could infer discriminatory animus from Patel's description of Dean Hamm's comments.  On December 3, 2020, the Court requested that the parties provide supplemental briefing addressing the adequacy of any causal link between Saketkoo's protected activity[113] and both Saketkoo's non-renewal and Dean Hamm's conversation with Patel.  Saketkoo's supplemental brief mentions the conversation with Patel only in passing and offers no description of any causal link between it and the protected activity.[114]  Tulane's reply argues that this is a forfeiture of her claim that the conversation was retaliatory.[115]  The Court disagrees and will apply Saketkoo's argument about her non-renewal to the conversation between Dean Hamm and Patel—though it notes that, as promised,[116] it has disregarded the portions of both parties' supplemental briefs that went beyond the scope of the requested subject matter.

In the context of her non-renewal, Saketkoo argues that "a plaintiff [who] cannot show close enough timing . . . can make up for it by providing additional

---

[112] R. Doc. No. 155.

[113] The Court requested that the parties, for purposes of the briefing, assume that both the 2018 conversation with Wild and the 2019 report were protected activity. *Id.*  As noted above, the Court concludes that the conversation with Wild was not protected—meaning that the only protected activity post-dates Tulane's decision not to renew Saketkoo's contract.

[114] *See* R. Doc. No. 157, at 5.

[115] *See* R. Doc. No. 159, at 1 n.1 (citing *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994)).

[116] *See* R. Doc. No. 155.

evidence" of a causal link.[117]   She adds that "[t]he combination of suspicious timing with other significant evidence of pretext can be sufficient to survive summary judgment."[118]   She directs the Court's attention to *Garcia v. Pro. Cont. Servs., Inc.*, 938 F.3d 236 (5th Cir. 2019), which she claims offers analogous facts.

An absence of tight temporal proximity does not doom a retaliation claim where there is other evidence of a causal link.   Title VII would offer little protection if it did.   But, as discussed above, Saketkoo offers no evidence of how, acting on retaliatory intent from September 2018 onwards, Lasky engineered the conversation between Dean Hamm and Patel; this dooms her cat's paw theory.

The case as to the conversation between Patel and Dean Hamm is closer.   Dean Hamm was aware of Saketkoo's 2019 protected activity—he was in the meeting where she claimed discrimination and eventually directed her to OIE.   And he, of course, made the decision to speak with Patel about Saketkoo.   But there is insufficient summary judgment evidence of his intent to retaliate for protected conduct.

Still, at the *prima facie* stage, a "[p]laintiff's burden is not an onerous one." *Smith v. Home Depot U.S.A., Inc.*, 102 F. Supp. 3d 867, 881 (E.D. La. 2015) (Engelhart, J.).   Because we know that Dean Hamm was aware of the protected activity, we can turn to temporal proximity, which due to the lack of other evidence, must be "very close."   *Breeden*, 532 U.S. at 273.   Absent "additional evidence,

---

[117] *See* R. Doc. No. 157, at 2 (citing *Feist v. Louisiana, Dep't of Justice*, 730 F.3d 450, 454 (5th Cir. 2013)).
[118] *Id.* (citing *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 409 (5th Cir. 1999)).

'temporal proximity of four months is not close enough.'" *Ganheart v. Brown*, No. 17-43, 2017 WL 3991182, at *5 (E.D. La. Sept. 11, 2017) (Africk, J.) (quoting *Ajao v. Bed Bath and Beyond, Inc.*, 265 F. App'x 258, 265 (5th Cir. 2008)). The Supreme Court has indicated that a three-month gap between the beginning of protected activity and an adverse employment action is insufficient to show causation. *See Breeden*, 532 U.S. at 273 ("This will not do.").

The parties agree that protected activity occurred on February 15, 2019, and into late March (when the formal OIE investigation was initiated). Patel's affidavit describes a conversation with Dean Hamm "in the summer of 2019."[119] On the recording,[120] Patel insinuates that the conversation occurred after June 2019. And Dean Hamm's deposition testimony offers no hint as to when during that time frame the conversation would have occurred.

Even assuming, then, that the conversation occurred July 1, 2019 (and Saketkoo offers no evidence to suggest that is when it did happen), that is more than four months after the non-renewal meeting—and more than three months after the OIE investigation was initiated.

The Court has made every effort to read the evidence (and Saketkoo's argument) on this point in her favor. However, the temporal proximity is simply not strong enough to overcome her failure to produce any evidence of Dean Hamm's

---

[119] R. Doc. No. 127-14, at 1.
[120] Which, as the Court acknowledged earlier in this opinion, is potentially inadmissible.

retaliatory intent.  Therefore, Saketkoo has not established a *prima facie* causal link. Her retaliation claim fails.

C.     Hostile Work Environment

Saketkoo alleges that Lasky's actions created a hostile work environment actionable under Title VII. "A plaintiff may establish a Title VII violation by proving that sex discrimination has created a hostile or abusive working environment." *Woods v. Delta Beverage Grp.*, 274 F.3d 295, 298 (5th Cir. 2001) (citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986)).

In order to establish a hostile work-environment claim, a plaintiff must prove five elements:

> (1) the employee belonged to a protected class;
> (2) the employee was subject to unwelcome . . . harassment;
> (3) the harassment was based on sex;
> (4) the harassment affected a "term, condition, or privilege" of employment; and
> (5) the employer knew or should have known of the harassment and failed to take prompt remedial action.

*Id.* (citing *Shepherd v. Comptroller of Public Accounts of the State of Texas*, 168 F.3d 871, 873 (5th Cir. 1999) (footnote omitted)).[121]

Assuming that Saketkoo has put forward enough evidence that Lasky would not have treated her as he did "but for" her sex,[122] Saketkoo has not established that

---

[121] Because the Court finds that Saketkoo's claim fails for other reasons, it does not address whether Saketkoo must set forth this element of the claim and whether Tulane may offer an affirmative defense.

[122] And the Court has serious doubts about this point. During her deposition, Saketkoo claimed that she never saw Lasky treat a man the way he treated her or heard of him abusing men. R. Doc. No. 127-4, at 24.  However, Saketkoo also acknowledged that she was aware of men at Tulane who had run-ins with Lasky—a point which appears to be undisputed. *Id.* She explained that, in her mind, the

39

the harassment affected a "term, condition, or privilege of her employment." *See Woods*, 274 F.3d at 298.

She argues that the five incidents described *supra* are sufficient to establish the fourth element of a *prima facie* hostile work environment claim because they were both severe and pervasive; either would be adequate.[123]  Saketkoo appears to argue that Lasky's harassment of her should be viewed as severe or pervasive "because Lasky was physically and emotionally threatening" towards women.[124]

"Sexually discriminatory verbal intimidation, ridicule, and insults may be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment violative of Title VII." *Weller v. Citation Oil & Gas Corp.*, 84 F.3d 191, 194 (5th Cir. 1996) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  "In order to be actionable, however, the challenged conduct must create an environment that a reasonable person would find hostile or abusive." *Id.* (citing *Harris*, 510 U.S. at 21).  "Whether an environment is hostile or abusive depends on a totality of circumstances, focusing on factors such as the frequency of the conduct, the severity of the conduct, the degree to which the conduct is physically threatening or humiliating, and the degree to which the conduct unreasonably

experiences are different because "even if [a man has] a run-in [with Lasky], the dance of it, the impact of it, the potentiality of the outcome and what's been threatened to you us very different if you're a male than if you're a female."  While the Court will assume for the sake of argument that this is indicative of some legally significant distinction, that should not be taken as an indication that it would find one existed.

[123] R. Doc. No. 150-1, at 20–23.

[124] *Id.* at 18.

interferes with an employee's work performance." *Id.* (citing *Harris*, 510 U.S. at 21). In order to satisfy this standard, conduct "must be 'sufficiently severe or pervasive [so as] to alter the conditions of . . . employment and create an abusive working environment.'" *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 330 (5th Cir. 2009) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)).

At the outset, the Court notes that evidence of Lasky's treatment of other women may well be evidence that contextualizes his interactions with Saketkoo. Moreover, if Saketkoo identified specific incidents of Lasky's harassment of other women that she witnessed or experienced, those could contribute to her experience of a hostile work environment. *See Waltman v. Int'l Paper Co.*, 875 F.2d 468, 477–78 (5th Cir. 1989) (holding that evidence of sexualized graffiti, some of which was not directed at plaintiff was, nonetheless, relevant to her claim and stating that "[e]ven a woman who was never herself the object of harassment might have a Title VII claim if she were forced to work in an atmosphere in which such harassment was pervasive" (quoting *Vinson v. Taylor*, 753 F.2d 141, 146 (D.C. Cir. 1985), *aff'd*, 477 U.S. 57 (1986))). However, the Fifth Circuit has found conduct that a plaintiff "did not personally experience" insufficient to render the plaintiff's own experience severe or pervasive. *Septimus v. University of Houston*, 399 F.3d 601, 612 (5th Cir. 2005); *see Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 652 (5th Cir. 2012) (questioning whether *Septimus* dictates "that evidence regarding other workers is never relevant" but concluding that it mandates at least that the "harassment must have affected a term, condition, or privilege of *the victim's* employment" (quotations omitted and

emphasis added)).  Because Saketkoo was not present for these interactions, they cannot render Lasky's interactions with Saketkoo severe or pervasive (though the other women might have claims).[125]

*"Severe"*

Saketkoo's argument that Lasky's conduct was "severe" for purposes of Title VII focuses on the September 13, 2018 incident.  She appears to argue that this was severe because she was "intimidated" and "fearful of being physically hurt by Lasky."[126]  In a footnote, she argues that this "should be considered" because "[c]ourts have recognized that physical injury is not dispositive and that a reasonable jury could find that a hostile work environment exists absent physical contact."[127]  She does not argue that Lasky made contact with her and she has testified that she "[did

---

[125] Saketkoo alleges in her declaration that she "observed . . . that . . . [Dr. Nereida Parada] . . . was frequently observed crying after interacting with Lasky." R. Doc. No. 138-13, at 6 ¶ 23.  She adds that "Parada approached [her] on several occasions . . . tearful and trembling and told me about [Lasky's] 'discriminatory' (her words) conduct against her as a woman."  *Id.*  Parada disputes Saketkoo's description of the events, saying in a sworn affidavit that Lasky "has respected" her, that she has "never found . . . Dr. Lasky or the Tulane work environment to be hostile towards women" and that she has never made a complaint about Lasky, "nor had any reason to do so." R. Doc. No. 127-11, at 2.  On the other hand, Parada adds, she has witnessed Saketkoo, who she describes as "a disruptive physician," "berate [a] nurse[.]"
To the extent that Saketkoo seeks to introduce a statement by Parada that Lasky discriminated against her to prove that discrimination occurred, this is hearsay.  And, to the extent Saketkoo suggests that, by virtue of witnessing Parada crying, she 'experienced' Lasky's discrimination against Parada, she offers the Court no caselaw to suggest that such an experience is actionable.  And even if it were, evidence of this occurring on "several occasions" would not render Lasky's conduct pervasive enough to create a hostile work-environment.  *See infra.*
[126] R. Doc. No. 150-4, at 19.
[127] *Id.* at 18 (citing, among other cases, *Royal*, 736 F.3d at 403).

not] think [Lasky] would of [sic] wanted her to believe" he would inflict bodily harm on her.[128]

Saketkoo is correct that inappropriate conduct need not include contact to create a hostile work environment for purposes of Title VII. *See, e.g.*, *Royal*, 736 F.3d at 403 ("It is unsurprising that we have held previously that a reasonable jury could find that coworkers created a hostile work environment despite having no physical contact with the plaintiff."). However, that unremarkable proposition does not, of course, imply that every incident lacking physical contact could reasonably be considered severe. *See Brown v. Liberty Mutual Grp.*, 616 F. App'x 654, 657 (5th Cir. 2015) ("[J]ob-related criticisms . . . are unlikely to support a hostile work environment claim."). In fact, "[i]solated incidents do not support a hostile work environment claim unless the complained-of incident is 'extremely serious' in nature." *Higgins v. Lufkin Indus., Inc.*, 633 F. App'x 229, 235 (5th Cir. 2015) (citing *Faragher*, 524 U.S. at 788).

*Royal* and the cases it cited are illustrative of this point and involved conduct of a very different sort than what Saketkoo describes. The plaintiff in *Royal* produced evidence of "sniffing and hovering over a woman, by two men, in a small, confined space." *Royal*, 736 F.3d at 401. And *Royal* described the harassment in *Farpella-Crosby v. Horizon Health Care*, 97 F.3d 803 (5th Cir. 1996), as "a coworker 'inquir[ing] about [the plaintiff's] sexual activity or ma[king] comments similarly offensive two or three times a week." *Royal*, 736 F.3d at 403 (quoting 97 F.3d at 806) (first alteration

---

[128] R. Doc. No. 127-4, at 39.

added).  And in *Glorioso v. Miss. Dep't of Corrs.*, 193 F.3d 517 (5th Cir. 1999), the plaintiff's co-worker allegedly called her a "bitch."  *Royal*, 736 F.3d at 403.[129]

Courts in the Fifth Circuit have found aggressive conduct similar to the conduct Saketkoo described insufficiently severe to sustain a hostile work environment claim.  *See, e.g.*, *Williams v. U.S. Dep't of Navy*, 149 F. App'x 264, 268 (5th Cir. 2005) (affirming grant of summary judgment denying hostile work environment claim where one incident consisted of harasser "yelling and displaying anger toward [plaintiff] over the fax machine toner").  In *Schindeler-Trachta, D.O. v. Tex. Health & Human Servs. Comm'n*, No. 17-257, 2020 WL 1902576 (W.D. Tex. Feb. 26, 2020) the alleged harasser "walked into Plaintiff's office 'unannounced and uninvited' and began a heated discussion about a patient transfer."  *Id.* at *3. "Plaintiff then exited her office pursued by Schwartz before abruptly returning to her office and closing her locked door on Schwartz, who continued his diatribe against Plaintiff through her door."  *Id.*  The court concluded that, while this and two other incidents were "admittedly unpleasant," they were not "severe enough to establish a hostile work environment under Fifth Circuit precedent."  *Id.* at *8.  In *Pennington v. Tex. Dep't of Family and Protective Servs.*, No. 09-287, 2010 WL 11519268 (W.D. Tex. Nov. 23, 2010), the plaintiff described her harasser as "always angry," "always hostile," and "always threatening."  *Id.* at *11.  She added that the harasser was "frequently yelling," and said that "[o]n at least one occasion" the harasser "screamed and yelled, . . . slammed files [and] doors, and was physically threatening towards"

---

[129] The Court notes that *Glorioso* involved a retaliation claim.  *See* 193 F.3d at 517.

her. *Id.* The court described this conduct as "woefully insufficient to show a hostile work environment in the Fifth Circuit." *Id.*

Saketkoo does not allege that Lasky made any advances or used sexually suggestive language in any interaction with her. And while the record indicates that Lasky referred to a different female doctor as a "bitch," Saketkoo does not suggest that she was present for that conversation or that Lasky used similar language with her.[130] Regardless of Saketkoo's subjective experience of the September 2018 incident, the Court cannot conclude that it was sufficiently severe for a reasonable person to find that Lasky subjected Saketkoo to an environment that was hostile or abusive.

*"Pervasive"*

As Saketkoo notes in her opposition, "[f]requent incidents of harassment, though not severe, can reach the level of 'pervasive,' thereby altering the terms, conditions, or privileges of employment such that a hostile work environment exists."[131] Saketkoo argues that the incidents described above "were pervasive and

---

[130] *See* R. Doc. No. 138-9 (declaration of Hana Safah, M.D.). The doctor in question, Hana Safah ("Safah"), stated that, during a phone call, Lasky called her a "bitch" and said "fuck you" and "screw you" repeatedly. Safah states that she "choose[s] not to interpret" the interaction as "gender based." In an earlier affidavit, Safah stated that she "[has] never experienced gender discrimination" at Tulane. R. Doc. 127-12, at 1. Regardless, Saketkoo has not claimed she was present for this interaction, nor does Safah suggest that she discussed this experience with Saketkoo prior to receiving "a telephone call from Michael Allweiss and [Saketkoo]" on September 18, 2020—the same day the instant summary judgment motion was filed. *See id.* Allweiss represents Saketkoo in this matter.

[131] R. Doc. No. 150-4, at 21 (quoting *Lauderdale v. Tex. Dep't of Crim. Justice, Institutional Div.*, 512 F.3d 157, 163 (5th Cir. 2007)).

altered the terms, conditions, and privileges of her employment."[132]  The Court notes that Saketkoo also states that "[i]n response to work-related questions, Lasky would frequently yell at and get close to Saketkoo in a physically threatening manner."[133] Saketkoo offers no details regarding these incidents and cites only her complaint as proof they occurred.[134]  Lastly, Saketkoo seems to suggest (based on the structure of her opposition) that Lasky's decision to "not allow Saketkoo to enroll any patients" in an "advanced sarcoidosis registry" which would have generated $1,500 for Lasky's section "for every two patients enrolled" constituted harassment.[135]  While Saketkoo alleges that Lasky allowed a male doctor to proceed with a study, Saketkoo does not explain how this constituted harassment.   Absent *any* explanation of how Lasky harassed her, the Court cannot conclude that this is an incident of harassment supporting Saketkoo's hostile work environment claim.

The Court cannot conclude that five (or, for that matter, ten) incidents over four years constitutes "pervasive" harassment under the Fifth Circuit's interpretation of Title VII.   In *Lauderdale*, the case Saketkoo cites, the plaintiff alleged that her harasser "called her ten to fifteen times *a night for almost four months*."  *Lauderdale*, 512 F.3d at 164 (emphasis added).  By way of comparison, in

---

[132] *Id.*

[133] *Id.*

[134] Such a statement is insufficient to make out a *prima facie* case.  *See West*, 960 F.3d at 742 (stating that plaintiff "cannot show . . . harassment was pervasive" where she "provides no evidence of [its] frequency").  Moreover, Saketkoo could have described twice as many incidents as she did without coming close to reaching what the Fifth Circuit treats as "pervasive."  *See infra*.

[135] *Id.* at 22.

*West* the Fifth Circuit concluded that three incidents and an indeterminate number of similar interactions that occurred "occasionally" did not constitute "pervasive" conduct.  960 F.3d at 742.  And in *Hernandez*, the Fifth Circuit concluded that four incidents of race-based hostilities directed at Hispanics, combined with evidence of hostility toward African Americans, were insufficient for the Hispanic plaintiffs' hostile work environment claim to survive summary judgment.  670 F.3d at 651, 654; *see also Jones v. Flagship Int'l*, 793 F.2d 714, 720–21 (5th Cir. 1986) (upholding district court's decision that three sex-based incidents did not indicate adequate pervasiveness, while noting that the district court "fail[ed] to recount in detail all of the incidents reported").

As noted *supra*, the test of whether harassment affected a term, privilege, or condition of a plaintiff's work for purposes of evaluating a hostile work environment claim involves weighing the totality of the circumstances, and no one factor is determinative. *See Weller*, 84 F.3d at 194.  However, the evidence produced indicates that the incidents identified by Saketkoo, to the extent they could conceivably be construed as sexual harassment, were neither severe nor pervasive.  For this reason, Saketkoo's hostile work environment claim under Title VII fails.

### D.    Saketkoo's Non-Title-VII Claims

*Equal Pay Act*

Saketkoo acknowledges that, on the record, she "cannot make a compelling substantive argument as to why dismissal [of her Equal Pay Act claim] should not

occur."[136]  However, she asks that the Court decline to dismiss the claim at this time because she is not in a position to oppose the motion due to "the limited discovery" she was able to obtain.[137]  Saketkoo offers no indication that further discovery would render her claim viable or any compelling argument that Tulane wrongfully withheld discovery.  The Court concludes that, in light of Saketkoo's concession, summary judgment is appropriate.

*Louisiana Assault*

Saketkoo states in her opposition that she is not pursuing a state law assault claim against Tulane.[138]  Consequently, the Court need not address the claim.

## IV.   CONCLUSION

As discussed, all of Saketkoo's remaining claims fail as a matter of law. Therefore,

**IT IS ORDERED** that Tulane's motion for summary judgment is **GRANTED** and that plaintiff's claims are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Tulane's motion in limine is **DISMISSED AS MOOT**.

New Orleans, Louisiana, December 31, 2020.

_____

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**

---

[136] R. Doc. No. 150-4, at 41.
[137] *Id.*
[138] *Id.*